## Tilman Watson *v.* Ira J. Williams.

1. Courts: judicial power: contempts.—The right of punishing contempts by summary conviction is a necessary attribute of judicial power, inherent in all courts of justice from the very nature of their organization, and essential to their existence and protection, and to the due administration of justice. It is a trust given to the courts, not for themselves, but for the people, whose laws they enforce, and whose authority they exercise; and each court has the power for itself, finally to adjudicate and punish contempts without interference from any other.

2. Same: same.—The right to punish for contempts extends not only to acts which directly and openly insult or resist the powers of the court or the persons of the judges, but to indirect and constructive contempts, which obstruct the process and degrade the authority of the court.

3. Same: probate court: power to imprison for contempt.—The Court of Probate has the power to imprison, by attachment, for a contempt, an administrator, guardian, or executor, for his failure or refusal to comply with any lawful order or decree of the court.

4. Same: high court: writ of error: does not lie in cases of contempts.— The constitution of this State declares, " That the High Court of Errors and Appeals shall have no jurisdiction but such as properly belongs to a court of errors and appeals." By the common law in existence in this State when the constitution was adopted, no appeal or writ of error lay to the judgment of a court on the subject of contempts, but each court was the sole and exclusive judge of contempts against its authority; and hence, this court has no jurisdiction to review the judgment of any inferior court in this State convicting a party of a contempt.

Appeal from the Court of Probates of Clarke county. Hon. John N. McKee, judge.

*Yergers* and *Anderson*, for appellant.

1. We suppose there can be no doubt that an appeal will lie from the decree in the Probate Court, ordering appellant to be committed to custody until he perform the former decree of the court.

This very point was raised in the case of *Vertner* v. *Martin*, 10 Smedes & Marshall, 103, 105, 107, but the court, nevertheless, exercised jurisdiction over the case.

The distinction is, that no appeal lies from a mere initiatory

order, as for an attachment to bring a party into court to answer for an alleged contempt, but if the court finally determine that the defendant is in contempt, an appeal will always lie from such decree. *McCredie* v. *Senior*, 4 Paige, 378; and authority, p. 382.

See, also to this effect, 3 Scammon, 402; *Stokely* v. *Commonwealth*, 1 Virginia Cases, 330; *Sloo* v. *The State Bank*, 1 Scammon, 440; *In the matter of Smithhurst*, 2 Sandford, 724; 6 Johnson, 335, 459, 453; Coke on Littleton, 288; 4 George, 384.

But, in point of fact, the doubt was never confined to this point, but to the point whether any other court could revise the discretionary action of a court attempting to enforce its own judgment or decree. There has been some controversy upon this point, but we imagine the better opinion is that either a writ of error or an appeal will lie in such cases.

Unless it be contended that an inferior court is positively incapable of committing an error in a proceeding for a contempt, it is difficult to conceive why this court should not exercise jurisdiction.

It is, indeed, true that courts of justice should have full power and authority to enforce obedience to their judgments or decrees, " but it is not necessary that it should be unlimited, uncontrolled, indefinite, arbitrary, and omnipotent." It is to be remembered that summary convictions are against the spirit and genius of our constitution, and in derogation of civil liberty. The judge is without check, and the accused without the usual guards of freedom. There is no grand jury to accuse; no petit jury to try; but his property and liberty depend upon the *fiat* of the court. Is there not the strongest necessity for the review of such convictions?

Is not the necessity for the check at least equal to the delegation of the power? 6 John. 468.

Lord Chief Justice Holt said, upon one occasion :—

" If there be a wrongful imprisonment by the House of Commons, what court shall deliver the party? Shall we say there is no redress, and that we are not able to support the laws upon which the Queen's people subsist? To conclude, all courts are so far judges of their own privileges, and intrusted with the power to vindicate themselves, that they may punish for contempts; but, to make them or any court final judges of them, exclusive of everybody

else, is to introduce a state of confusion, by making every man a judge in his own cause, and subverting the measures of all jurisdictions."

And in this country, it has frequently been made a question, whether commitments for contempts, were not in violation of the constitution.

But admitting, that a writ of error will not lie, an appeal will; the court, by which an appeal is granted, may waive its privileges, and consent that its action be revised. There seems to have been no controversy on this point. 6 John. 467.

This was an appeal.

But the rule on this subject, where a writ of error is brought, seems to be this: that where the court below exceeds the limits of its power, or has no jurisdiction, that in such a case the High Court will and must necessarily entertain the case, but where the court below has jurisdiction, and at the same time exercises its power to punish, within the limits of its power as ascertained by law, that in such a case, the High Court will not disturb its action, unless probably, the court below has exceeded the limits of proper discretion.

The Supreme Court of Kentucky has decided nearly in accordance with these views, and covers all the points embraced by the appeal. In *Berkley* v. *Commonwealth*, 2 J. J. Marshall, 575, the Court of Errors and Appeals says: "In cases of contempt, the appellate court has authority to correct erroneous judgments and sentences, although it cannot retry the question of contempt or no contempt. Suppose for instance, a Circuit Court should inflict a fine of five hundred dollars for a contempt, without the intervention of a jury, when the statute limits the offence to ten dollars, might not this court rectify the errors? We see no objection to it." 1 Bibb. 598, was cited contra, but the court thus explained that decision. See also, 3 Scammon, 402; 3 Mason, 482; 1 Rand. 242; 6 Cowen, 581; 1 Virginia Cases, 330; 6 Johnson, 335, 459, 453; 4 George, 384. The proceedings in this case are civil in form and criminal in substance. 7 Paige, 325.

It appearing then, that this court, both upon principle and authority, has jurisdiction, we think the decree must be reversed on the following grounds.

2. The last decree directed the appellant to be imprisoned for a contempt, in not delivering up the property admitted by him, in his inventory, without process having been first served on him.

The court had no jurisdiction to adjudge him to be in contempt, until an attachment was served upon him, and this is a prerequisite step under our statute and the common law. Revised Code, 460, art. 144; 6 Cowen, 581; 5 Johnson, 117; 2 Virginia Cases, 408; 3 Mason, 482.

The record does not show that any process was served. At pages 22 and 23, is the petition of the succeeding guardian, asking the court to compel the former guardian to deliver up the property. At pages 23, 24, 25, is a final decree, committing the appellant to prison, in accordance with the petition. In the first place there is no recital in the decree that any process was ever served. The decree merely recites, that on reading and filing the petition of Williams, guardian, and it appearing to the satisfaction of the court, that Watson had not delivered up the property, according to the orders of the court, &c. It does not recite, that any process was issued or served upon him, to answer for a contempt, consequent upon a disobedience of the order. This was manifestly erroneous. See 4 George, 382, and above authorities.

But even if the decree did recite that process was served, this would not have sufficed. In a superior court it would have been sufficient, but a probate court is one of inferior jurisdiction. It has no jurisdiction except what affirmatively appears by the record. In order that its jurisdiction should, in this instance, affirmatively appear, the record should set forth a written notice, executed and returned.

3. We ask the court also to pass upon the following and succeeding points.

To what extent has a court jurisdiction to punish for a contempt? This is an important question.

It would seem that a commitment can not be decreed for a longer time than the term during which the court sits.

This question is decided by the Supreme Court of the United States, in *Anderson* v. *Dunn*, 6 Wheaton, 230. In answer to this question, the court says, " Analogy and the nature of the case furnish the answer: 'the least possible power adequate to the end pro-

posed;' which is the power of imprisonment.   It may at first view, and from the practice of our legislative bodies, be thought to extend to other inflictions.   But every other will be found to be a mere commutation for confinement, since commitment alone is the alternative, where the individual proves contumacious.   And even to the duration of imprisonment, a period is imposed by the nature of things, since the existence of the power that imprisons, is indispensable to its continuance ; and although the legislative power continues perpetual, the legislative body ceases to exist, on the moment of its adjournment or periodical dissolution.   It follows, that imprisonment must terminate with that adjournment."   And this of course applies to all commitments.   The same principle is more applicable to courts of justice.

And, in fact, the exercise of this power to this extent would, in nearly every case, affect the object in view.   The power is of an extraordinary nature, and manifestly should not exceed the bounds imposed by the very nature of things.   "*In medias res*" is safety and security.   See also *Berkley* v. *The Commonwealth*, 2 J. J. Marshall, 575 ; *King* v. *James*, 5 Barn. & Alderson, 894.

The same principle is strongly enforced by De Witt Clinton, in *Yates* v. *The People*, 6 John. 506–7, wherein he shows that the power of committing, during pleasure, seems to have been borrowed from the indefinite and omnipotent privileges claimed by the Lords and Commons; but that, in commitments by either house of Parliament, the imprisonment ceases with the adjournment.

He admits, of course, that, within the term, the imprisonment may be made to terminate upon the doing of a certain act on the part of the prisoner; or, in other words, that it might be indefinite during the term.   The order of commitment in that case was like this.

The appellant in this case was, by the terms of the last decree, committed until he delivered the property to the newly appointed guardian.   This was, of course, indefinite in duration, or, at least, he was committed generally; and the commitment, as a matter of course, may have, from its very terms and the consequences flowing from them, extended beyond the term.   The term, or any length of time included within it, should have been stated.   Otherwise,

under the operation of the decree, he might stand committed after the term had expired.

The same principle applies to the previous orders committing him for not returning an inventory ; and, after he had returned an inventory, for not returning a true and correct one.

4. Again, in the final commitment, and in the previous commitment, for not returning a true and correct inventory, the court ordered the prisoner to be transferred from Clarke to Lowndes county. The power to do this was also not within the jurisdiction of the Probate Court ; for it had no jurisdiction beyond the county. It cannot direct a warrant of commitment to another county, without a statute authorizing it. *Sherry* v. *Wintin,* 1 Carter (Ind.) 96 ; *Ibid.* 1 Smith (Ind.) 1.

5. Previous to the last decree, committing the appellant for not delivering the property to the newly appointed guardian, two orders were made,—the first committing him for contempt, upon his failure to make a report, or return an inventory. This order decreed that he should be committed until he made his report, or was released by due course of law.

This commitment cannot stand ; in the first place, because it was, as we have before seen, indefinite in point of time. He should have been committed during the period embraced by the term, or some definite time embraced within the term.

Again, in this proceeding, the judge acted in most extraordinary haste, and without allowing Watson any time to make out his inventory. The proceedings, as they appear of record, previous to the first commitment, which we are now considering, are as follows. An order for a citation to Watson, rendered at the January term, 1858, requiring him to return an inventory at the next regular term (not specifying any particular time). A citation upon that order to him to appear on February 1st, 1858. On the 2d February, an order for an attachment was granted, directing that he make a report instanter. And upon this order, and upon the same day, an attachment was granted, returnable without delay. And on the same day it was executed. It does not appear at what time during the day ; it may have been, and doubtless was, after adjournment. On the next day (it may have been the first proceeding the next morning), the court committed him. There is

thus the strongest reason to suppose that the party was adjudged without a reasonable chance to be heard.

Again, this attachment should not have been issued in the first instance. 1 Smith's Ch. Practice, 623; 6 Eng. Ch. 382; 6 Vesey, Jr. 488; 1 Jacob & Walker, 376; 4 Johns. Ch. 173; 1 Barb. Ch. Pract. 636.

"No person shall be accused, arrested, and detained, except in cases ascertained by law, and according to the form which the same has prescribed." Sect. 12, Declaration of Rights.

In the second, and also the last commitment, no attachment whatever issued. The party was committed without being suffered to be heard in his own defence, in shape or form. It will be observed, that this first order recites that the party was in contempt the previous term, but he was not committed for any offence, except, probably, under this order. Again, the proceedings are not set forth. Again, he was committed, in this instance, under the order made at the previous term, requiring him to report at the next regular term.

But, in point of fact, the action of the court below, we submit, has released him from imprisonment under this order.

The appellant, under this order, did make a report and return an inventory, under oath. By thus obeying the order he, in this particular case, purged himself of contempt. This is all that the order substantially required to purge him of contempt in this instance.

Again, the practice of the Probate Court is analogous to the practice of the Chancery Court, when there is no settled practice of its own, or of the ecclesiastical courts of England. Chilton on Probate Court, 25. And, in a case of an analogous character, where a party is in contempt for want of an answer, he is entitled to, be discharged immediately upon his putting in his answer. Nothing further is necessary to be done. 1 Vesey & Beames, 324; 1 Dickson, 133; 1 Russ. & My. 523; 1 Vesey, 111.

But, again, the subsequent action of the court shows conclusively, that it had waived the contempt under this order. Watson filed his inventory under oath. The court recommitted him for contempt, because he did not return a true and correct inventory, and sufficiently purge himself. That inventory was *prima facie* correct.

15 New Hamp. R. 190–196. This second order regarded him as still being in contempt, because he had not returned a correct inventory. That inventory was *prima facie* correct; and, in fact, no suggestion, either by the court or any one else, was made showing wherein it was incorrect. The appellant was not asked to prove it. There is no evidence in this record showing that it was, in any respect, false.

But, again, the court waived the contempt; the final order was predicated upon admissions made in appellant's inventory. If any step is taken, or move is made, predicated upon such admissions, the contempt is thereby waived. 1 Simons & Stuart, 393; 5 Beavan, 141.

6. The same general principles apply to the second order, recommitting appellant, except this much further,—he was (as was the case in the final decree) committed without an opportunity being afforded him to prove the correctness of the inventory, or purge himself; again, he was committed for not returning a correct inventory, when the inventory was *prima facie* correct, and there was no evidence offered to overthrow that presumption—when no suggestion from any source was made, asking the appellant to prove its correctness, or pointing out in what respect or particular it was incorrect.

7. But, again, the court committed him when its power and jurisdiction had ceased; and this also applied to all the commitments, for this reason. He was committed for failing to perform duties connected with a trust which had been, by the court, previously revoked. The special supervisory power over a guardian, continues in full force until his removal. Until then he is under the control of the court. But after his removal, he has no further duties as a guardian to perform, and the court has no power to compel to the discharge of matters, which only pertain to him, not as an individual, but as a guardian, as a person bearing a confidential relation to the court.

The mode to obtain reparation, after his connection as guardian had ceased, was to put his bond in suit. A bond covers all defaults, and is probably designed to embrace cases of this nature. Its efficacy is particularly and pertinently apparent in such cases.

All the commitments were made after the appellant had been removed from his trust.

It is manifest, then, that in these proceedings the court acted without authority, or due regard to the rights of appellant. He may have conducted himself improperly; but his conduct cannot be drawn in question, except by the application of legal rules.

We suppose there can be no doubt, that an appeal from the final decree of commitment brings up for consideration the two previous orders, &c., of commitment. The rule on this subject is, that it brings up for consideration all previous orders or decrees in any way connected with the final decree. 1 Cowen, 691; 5 Ib. 719; 2 Ib. 195, 208; 17 Johnson, 548.

In this cause, all the orders for commitments are successively connected with and dependent upon each other. The final decree is predicated upon the admissions forced by the previous orders, and is closely connected with, and influenced by them in other respects. In fact, the merits of the final decree are dependent, to a great extent, upon the other orders. All have reference to the same general subject-matter, viz., returning a correct inventory, and delivering up the property embraced by it.

No counsel appeared for appellee.

HARRIS, J., delivered the opinion of the court.

At the July term, 1856, of the Probate Court of Clarke county, the appellant was appointed guardian of the minor heirs of Elizabeth Peterson.

At the September term of said court, one of the sureties on his guardian's bond, John Adams, filed his petition in said court, praying to be discharged from further liability on said bond. Citation was issued to the said plaintiff in error, to appear at the October term of said court, to answer said petition, and show cause why the said Adams should not be discharged, and the said plaintiff in error be required to give further security.

Said citation was duly executed; and, at the October term of said court, the said Adams was discharged from further liability on his bond, and citation ordered to plaintiff in error, to appear at the next term, and give additional security. Citation was issued and served, in pursuance of said order, returnable to the November term of said court.

The record does not show that security was ever given.

Afterwards, at the January term, 1858, of said court, citation was ordered to issue to said plaintiff in error, to appear and return an inventory, as guardian, as aforesaid. Citation was accordingly issued, and returned executed.

At the February term, 1858, of said court, an attachment was issued for said plaintiff in error, to compel a report, as guardian, which was executed by the sheriff, by taking the body of said plaintiff in error into his custody. And, on the 3d day of February, 1858, the said plaintiff in error, as the order recites, "contemptuously refusing to comply with the order of the court in the presence of the court, he was, by the order of the court, committed to the jail of said county, until he should comply with said order." The said plaintiff in error, having made his escape from the sheriff, a writ of attachment was ordered, which was returned executed.

His letters of guardianship were subsequently revoked, and the defendant in error appointed guardian in his stead.

The said plaintiff in error then filed an account for final settlement in said court, showing that he was in possession of a number of negroes belonging to his wards.

At the March term of said court, an order was made, committing the plaintiff in error to jail, for failing to make a true and correct account of his guardianship, and for not purging himself of the contempt adjudged against him at a former term, and still contemptuously persisting therein, until he should purge himself of said contempt, and render a true account of his guardianship.

And also, upon the petition of the defendant in error, and upon proof that the plaintiff in error refused to deliver the property of the said minors to the defendant in error, their guardian, according to the order of the court, an order was made, committing the plaintiff to the jail of Lowndes county for safe keeping, until he comply with the order of the court.

Afterwards, on the 8th September, 1858, upon a petition to the clerk of the Probate Court, an appeal was prayed to this court.

A preliminary question, as to the jurisdiction of this court, to entertain causes of this character, under our constitution and laws, seems to demand inquiry before proceeding to consider the grounds of error assigned.

The record shows, that this cause is prosecuted here to revise the proceedings of the Probate Court of Clarke county against the plaintiff in error, for *a contempt* of the process, orders, and judgment of that court, in a matter over which it had, by the constitution, full jurisdiction.

"The process of attachment for contempts, must necessarily be as old as the laws themselves. For laws, without a competent authority to secure their administration, from disobedience and contempt, would be vain and nugatory. A power, therefore, in the supreme courts of justice, to suppress such contempts by an immediate attachment of the offender, results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal. Accordingly we find it actually exercised as early as the annals of our law extend." 4 Black. Com. 286.

The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and coexisting with them by the wise provisions of the common law. A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it. In this country, all courts derive their authority from the people, and hold it in trust for their security and benefit. In this State, all judges are elected by the people, and hold their authority, in a double sense, directly from them; the power they exercise is but the authority of the people themselves, exercised through courts as their agents. It is the authority and laws emanating from the people, which the judges sit to exercise and enforce. Contempts against these courts, in the administration of their laws, are insults offered to the authority of the people themselves, and not to the humble agents of the law, whom they employ in the conduct of their government. The power to compel the lawless offender, against decency and propriety, to respect the laws of his country, and submit to their authority (a duty to which the good citizen yields hearty obedience, without compulsion) must exist, or courts

and laws operate at last as a *restraint* upon the upright, who need no restraint, and a license to the offenders, whom they are made to subdue.

Chancellor Kent, in the case of *Bates*, 4 John. R. 353, in concluding a review of the English cases on this subject, says: "The trust is given to the courts, not for themselves, but for the public, who are deeply interested in the preservation of this power, in its accustomed vigor."

He cites the case of the *Earl of Shaftesbury*, 2 St. Tr. 615; 1 Mod. 144; who was imprisoned by the House of Lords for "high contempt committed against it," and the case brought into the King's Bench, where the court held, that they had no authority to judge of the contempt, and remanded the prisoner. "The court," says he, "in that case, seem to have laid down a principle from which they have never departed, and which is essential to the due administration of justice; this principle, that every court, at least of the superior kind, in which great confidence is placed, must be *the sole judge,* in the last resort, of contempts arising therein, is more explicitly defined, and more emphatically enforced, in the two subsequent cases of *The Queen* v. *Patty et al.* 2 Lord Raym. 1105, and of *The King* v. *Crosby*, 3 Wilson, 188; 2 Black. R. 754."

In Crosby's case, the language of the judges is singularly impressive. Lord Chief Justice De Grey observed, that "when the House of Commons adjudge anything to be a contempt, or a breach of privilege, their adjudication was a conviction, and their commitment in consequence was execution; and that no court could discharge or bail a person that was in execution by the judgment of any other court. . . . That in the case of a commitment by the King's Bench or Common Bench, there was no appeal; that if the courts should abuse their jurisdiction, it would be a public grievance, and redress must be sought from the legislature; that the constitution had provided checks to prevent its happening. It must be left at large; it was wise to leave it at large. Some persons, some courts, must be trusted with discretionary powers; and, though it is possible, it was in the highest degree improbable, that such abuses should ever happen."

Mr. Justice Blackstone pursued the same train of observation, and declared that all courts—by which he meant to include the two

houses of Parliament, and the courts of Westminster Hall—" could have no control in matters of contempt; that the sole adjudication of contempts, and the punishments thereof, belonged exclusively, and without interfering, to each respective court; that infinite confusion and disorder would follow, if every court of the Hall should have power to examine the commitments of the other courts for contempts; that the judgments and commitments of each respective court, as to contempts, must be final, and without control. It was a confidence that might, with perfect safety, be confided in the judges and the houses of Parliament. That the objection, as to abusive consequences, proved too much, because it was applicable to all courts of dernier resort; and general convenience must always outweigh partial inconvenience."

Chancellor Kent, after these citations, adds: "I have cited the opinions of other judges much at large, because I could not hope to improve upon the strength of their observations; and I entertain the most perfect conviction, that the law, as they declared in this case, was well understood, and definitely established as part of the common law of England at the time of our Revolution. Mr. Justice Grose, many years afterwards, thought he did enough to prove the settlement of the law on this subject, by merely quoting this very able decision of Lord Chief Justice De Grey."

This decision, and the reasoning employed by the judges, is adopted and fully sanctioned, by the Supreme Court of the United States, in *Ex parte Kearny*, 7 Wheat. 38, in an able opinion delivered by Judge Story.

These cases were also considered and reviewed by Cowen, J., in the Supreme Court of New York, and approved as declarative of the common law of England. He says, "that it was agreed in the *Mayor of London's case* (Crosby), 3 Wilson, 188, that in cases of commitment for contempt, by the Lords or Commons, or by any other court of general jurisdiction, no other court had power to interfere, and relieve by *habeas corpus*, or in any other way, because there was no appeal." Blackstone, J., said, "The sole adjudication of contempts, and the punishment thereof, in any manner, belongs exclusively, and without interfering, to each respective court." And De Grey, Ch. J., said, "In case of a commitment by this court, or the King's Bench, there is no appeal."

*The People* v. *Nevins*, 1 Hill, N. Y. R. 164–5.   See the late case of *Stockdale* v. *Hansard*, 9 Adolphus & Ellis, 1; 36 E. Com. L. R. 13.

" The right of punishing contempts by summary conviction, is inherent in all courts of justice and legislative assemblies, and is essential for their protection and existence.   It is a branch of the common law, adopted and sanctioned by our State Constitution.   The discretion involved in this power, is in a great measure arbitrary and undefinable, and yet the experience of ages has demonstrated, that it is perfectly compatible with civil liberty, and auxiliary to the purest ends of justice.

" The known existence of such a power, prevents in a thousand instances the necessity of exerting it, and its obvious liability to abuse, is, perhaps, a strong reason why it is so seldom transcended. This power extends not only to acts, which directly and openly insult or resist the powers of the court, or the persons of the judges, but to consequential, indirect, and constructive contempts, which obstruct the process, degrade the authority, or contaminate the purity of the court.   4 Black. Com. 280; 2 Hawk. Pl. Cr. b. 2, c. 22; 1 Com. Dig. Attachment, A.

" The officers of the court are peculiarly subject to its discretionary powers, and may be punished in this summary manner, for oppression, extortion, negligence, or abuse in their official capacity. 1 Bac. Abr. tit. Attachment; 2 Hawk. tit. Attachment; 3 Atk. 268."

Per Senator Platt, in *Bates* v. *Lansing*, 9 John. R. 415–16.

The same doctrines of the common law are discussed and admitted, in *Hollingsworth* v. *Duane*, reported in Wallace, C. C. R. 77.

So in Mississippi, the power of the courts to fine and imprison for contempt, as a necessary incident of judicial power, independent of statutory enactment, inherent in the very nature of their organization, and derived from the constitutional provision which gave them being, *ex necessitate rei*, has been repeatedly recognized by her judicial tribunals.   In *Lewis* v. *Garrett's Adm'r.* 5 How. Miss. R. 453, the doctrine is clearly stated and enforced, both upon principle and authority, by Judge Trotter. So in *Vertner* v. *Martin*, 10 S. & M. 103.   The power of the Probate Court, to imprison by

an attachment, for a contempt, an administrator, for failing to pay a sum of money, which he had been previously ordered to pay, was sustained, and Walker's R. 310, cited as authority for such proceeding.

This case was a writ of error to the High Court. No opinion was expressed, however, as to the power or jurisdiction of the High Court, on the subject of contempts against other jurisdictions.

And in the case of *Adams*, 25 Miss. R. 883, before Justice Yerger, on *habeas corpus*, these doctrines are ably discussed, the authorities reviewed, and the same conclusions announced.

In Kentucky, in the case of *Johnston* v. *Commonwealth*, 1 Bibb's Kentucky R. 598, this subject is discussed with reference to the power of the Court of Appeals to review judgments and orders for punishing contempts in other jurisdictions, and denied. After reviewing the doctrine of the common law on this subject, Chief Justice Bibb thus concludes his able judgment :—

" The inconveniences which might result from sustaining writs of error and appeals from orders for punishing contempts are worthy of great consideration. We ought, indeed, to weigh well the consequences, before we give a deliberate sanction to a procedure never once recorded in juridical annals, from the earliest periods down to the present day, except in the two cases just cited. The great purposes for which courts are intrusted with the power of punishing contempts demand a speedy and summary proceeding, not consisting with the delays consequent on writs of error and appeals. If, free from the apprehension of immediate punishment, the contemptuous witness, in the face of the court, and in the very act of trial, might paralyze the hand of justice by refusing to give evidence, the poison would circulate through every artery of the judicial system. In fact, the rights, liberty, and property of the whole community are immediately involved, and interested in the support of the constituted authorities. What are laws without the means competent to secure and enforce a due obedience ?

" To this end, a power in courts of justice to suppress contempts and disobedience to their authority, by immediate punishment, is essentially necessary, and results from the first principles of judicial establishments. Laws are necessary to the good order of society. Courts are ordained by the laws as necessary for their due adminis-

tration.    Hence, due respect for the courts of justice is as necessary as a regard for the laws themselves.

" For, when once such respect is lost among the people, the authority of the court is at an end.    And that court is impotent and contemptible indeed whose power to punish a contempt to its authority, depends upon the discretion of a superior.

" It seems to be an established principle of law that one court cannot punish a contempt committed against another court.    Intimately related to this is another sentiment,—that one court cannot judge of a contempt committed against another.    In fine, it seems necessary to the very existence of a court, in the healthy exercise of its powers, that it should have the exclusive jurisdiction to judge of contempts to its authority.

" But it may, perhaps, be asked, if each court is suffered to exercise the power of punishing contempts, without the control and revision of any other court, where is the security of the citizen against the arbitrary oppression of the judge, by a wilful infraction of the law ?    It is answered, that the citizen finds security in his own correct demeanor; in the great lenity and unwillingness which has generally been remarked in courts to resort to this exercise of their powers ; but above all, in that responsibility which the judge owes to the assembled representation of the country, for any corrupt or wilful and arbitrary abuse of his power.

" It is the boast of our government, that no officer, however exalted his station may be, is above the law; neither can he indulge a wild, arbitrary, or licentious disposition, without responsibility."

Government cannot be administered without committing powers in trust and confidence.    The exercise of discretion must be intrusted by the people to some agents, in matters of this character. And it seems to us to be safer and more satisfactory, under our system, to leave it in the hands of the respective courts, immediately deriving their authority from the people, and amenable to the public for its just and wise exercise, than to place it in the hands of an appellate tribunal, removed, in a great measure, from their scrutiny as well as their direct authority.

Whether considered, therefore, with reference to the protection of the authority and just power of the courts, or with regard to the

Watson v. Williams.

protection of the liberty of the citizen against the unjust and tyran-
nical exercise of power, a due regard for the security of all will be
best promoted, by leaving the whole subject of contempts to the
courts respectively, without interference from this court.

So, in Tennessee, in the case of *Andrew L. Martin*, 5 Yerger,
456, the same doctrines are announced as in Kentucky, by Ca-
tron, J., and powerfully enforced, denying the right of appeal or
writ of error to serve judgments for contempts when the court has
jurisdiction.

So, in Indiana, in the case of *The State* v. *Tipton, Sheriff*, 1
Blackf. R. 166, the writ of error was dismissed,—the court hold-
ing that courts of record have exclusive control over charges for
contempt; and their conviction or acquittal is final and conclu-
sive. "This great power," says the court, "is intrusted to these
tribunals of justice, for the support and preservation of their re-
spectability and independence; it has existed from the earliest
period to which the annals of jurisprudence extend; and except in
a few cases of party violence, it has been sanctioned and established
by the experience of ages,"—referring to English and American
cases, already cited.

And, in Illinois, in the case of *Clark* v. *The People*, Breese R.
266, the same principles are held by the Supreme Court of that
State.

Indeed, in the absence of any constitutional or statutory regula-
tion on the subject, it is believed the authorities are uniform on
this point.

Upon examination of our constitution and laws, we are unable to
perceive any authority for the assumption of jurisdiction in such
cases.

The constitution says, " The High Court of Errors and Appeals
shall have no jurisdiction but such as properly belongs to a court of
errors and appeals." To ascertain what jurisdiction properly belongs
to a court of errors and appeals, reference must be had to the system
whence we have derived the great body of our unwritten laws,—the
common law of England. We have just seen—from a review of
the decisions of highest authority, both in England and this coun-
try—that, by the common law, such jurisdiction *does not properly
belong to a court of errors and appeals.* Hence, our constitution,

seems not only, not to confer, but to deny, this jurisdiction to our High Court of Errors and Appeals.

The power in question is one absolutely necessary to enable the Probate Court to protect, preserve, and administer the estates of decedents, and to save the property of infants from waste and spoliation by unprincipled men, who may have obtained the management of either, by fraud or imposition, or without sufficient security. If, for every order or decree made by that court, requiring executors, administrators, or guardians, to make returns, or file inventories, or do or perform any other duty which the court, under the law, may and ought to require, and imposing penalties for disobedience, such executor, administrator, or guardian, may take an appeal, and disregard the order, estates could never be administered, and the appointment of a guardian would operate to the divestiture of the estate of the ward ; in many cases, in favor of the unprincipled guardian.

Our laws are not thus deficient : while they amply protect the liberty and rights of the citizen, they as amply provide for the prevention and punishment of the wrongs he may seek to inflict.

Let the appeal be dismissed, for want of jurisdiction in this court.