## CIRCUIT COURT OF NORFOLK COUNTY

W. C. Elam

v.

Commonwealth of Virginia

May 2, 1898

By JUDGE R. R. PRENTIS

[This was a writ of error from the County Court of Norfolk County.]

The admitted facts are that an editorial was published in *The New Daily Pilot*, April 23, 1896, of which newspaper the plaintiff in error was the editor, charging in plain and unequivocal language (among other things) that aid and comfort (under color of law) were being openly and outrageously extended to an alleged criminal, "his gang and his allied bullies;" that the "authorities of Norfolk county, including magistrates, grand jurors and the county court," were "actively, zealously and unblushingly acting together to deliver" such alleged criminal from the just grasp of the authorities of Norfolk city; that all of this was being done not that the criminal might be punished, but that they might "shield and deliver him and keep him at large as a terror to all law-abiding people, and to all who would put down lawless disorder."

The plaintiff in error was indicted for contempt of court, arraigned, tried and found guilty; the jury fixing his fine at $50.

Under every form of government, which is able to maintain its own existence, there must always be somewhere

a sovereign authority with power to enforce all of its own decrees. Under our system the people themselves claim and hold this ultimate sovereignty. From them the courts and all the other departments of the government derive their limited powers. The sovereign people express their will or law through their agents, and when expressed all citizens owe it their respect and allegiance.

The courts, by the will of the sovereign people, are intrusted with so much of this ultimate sovereignty as is necessary for the due administration of justice. Any attack upon them, therefore, certainly while in the act of administering justice, is an attack upon the sovereign people, whom the courts simply represent and serve. It is an assault upon the government which the people have ordained. Of course as to his private conduct and affairs, the judge cannot be accorded any special privilege. He must defend himself from unjust aspersions here just like other men. Not so when he is exercising his official duties. The sorry spectacle of a judge descending from his high public place to vindicate his official conduct, either by personal violence or by a suit for damages, would be unseemly and intolerable. A wrong committed against him thus in his public capacity is a wrong to the government he represents. It should be punished not as a private injury, but as a public wrong. So contempts of court have always been treated, and so it must continue if the courts themselves are to continue. The judge, by the very nature of his office, is of necessity constantly placed in positions of antagonism to those whose rights he determines. His judgments necessarily cross and thwart the purposes of unsuccessful suitors. He should, as a matter of public policy, therefore, be protected by the whole power of the State from the malicious assaults of disappointed litigants, as well as from attacks, criticisms and influences which would, in advance, direct and control his judgments for selfish and evil ends. *Dandridge's Case*, 4 Va. (2 Va. Cas.) 408 (1824).

The law and the reason of it have been happily expressed in the opinion of the court in thee case of *Watson v. Williams*, 36 Miss. 331.

> The right of punishing contempts by summary conviction is a necessary attribute of judicial

power, inherent in all courts of justice from the very nature of their organization, and essential to their existence and protection and to the due administration of justice. It is a trust given to the courts not for themselves, but for the people whose laws they enforce and whose authority they exercise.

It is said that this is a large and dangerous power. Certainly it is large, but it is necessary that the power be lodged somewhere, if our present form of civil government is to be maintained. If the people select a worthy judiciary the power is not dangerous. In the past it has been rarely abused, and has, almost without exception, been used for the public good and with the greatest possible leniency and tenderness towards those who have persisted in provoking its exercise.

The honest judge who fearlessly and faithfully discharges his duty, must expect that honest differences of opinion and adverse interests will lead to criticisms of his views and discussions which are neither complimentary nor pleasant to him. He will also have to bear intemperate and unjust criticisms which are inspired by malevolence or ignorance, as patiently as he can. When, however, these limitations are passed and the attempt is made to usurp the functions of the court, to undermine its authority and bring its proceedings into public contempt, the offense becomes a crime against the State and its people. It must be punished by the Commonwealth, whose authority the offender would degrade.

What, then, if the judge is corrupt, and unworthy of his high commission? The remedy is the only effective remedy than can be devised, and it is ample: impeachment, disgrace and removal from office. The people who gave him his authority can take it away. We should not fear that they will fail to exercise their power when the occasion arises.

The misdoings of the alleged criminal referred to in the editorial complained of, were, at the very time of the publication, under investigation. There was a difference of opinion as to whether the locality of the crime was in Norfolk city or Norfolk county. The manifest tendency of such a publication, at that time, was to in-

fluence and affect the judgment of the public, from whom the trial jury was to be selected; to embarrass, obstruct and impede such investigation; to influence, direct and control the final result.

It is needless to quote authorities to show that such a publication, under such circumstances, was a contempt of the court of the very gravest character. They are abundant. See note to *Percival v. State*, 50 Am. St. Rep. 572.

It only remains to consider whether there are any technical errors in the proceedings which justify reversal. It is claimed that the statute giving justices exclusive original jurisdiction in misdemeanor cases (Acts 1895-6, p. 924) took away the jurisdiction of the county court to try this case. This is not tenable. First, because only the court against which a contempt is committed is the proper court in which to try it. Note to *Clark v. People*, 12 Am. Dec. 183. Secondly, because the act does not in terms refer to contempts, nor attempt, in the most remote way, to deal with the pre-existing common and statute law as to them; and, thirdly, if it did so undertake to take away from courts the right to punish for contempts, it was an unwarranted attempt of the legislative to invade the judicial department of the government; and hence a violation of Article II of the Virginia Constitution, which provides that "[t]he legislative, executive and judicial departments shall be separate and distinct; so that neither exercise the powers properly belonging to either of the others; nor shall any person exercise the power of more than one of them at the same time, except as hereinafter provided." *State v. Morrell*, 16 Ark. 454 (1855).

The county courts in Virginia derive their existence from the Constitution. In the well-considered case of *State v. Frew*, 24 W. Va. 416 (1884), it is expressly decided that the power to punish for contempts is inherent in all constitutional courts springing into existence upon their creation, as a necessary incident to the exercise of the powers conferred upon them, and applies as well to constructive as to direct contempts. "The power to punish for contempt exists in all courts independently of the statute and is essential for their protection and

existence." Note to *Ex parte Robinson*, 22 L. Ed. 205 (1974), and cases cited.

The Virginia statute, section 3768 of the Code, provides that the courts may "issue attachments for contempt and punish them summarily for misbehavior in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice." In Ohio, under a similar statute, it is held that the publication of an article calculated to obstruct the adminstration of justice comes within the statute, although the article be not written or circulated by the writer in the presence of the court, where the publication was in the courtroom as well as elsewhere, and was intended to have effect, and did in fact have effect there. *Myers v. State*, 46 Ohio St. 473, 22 N.E. 43 (1889).

In the case at bar there was no attempt to punish under the statute, "summarily," but there was a formal indictment and a trial by jury, in which the plaintiff in error had every opportunity to defend himself, and the advantage of every presumption which the law, in its tenderness, gives to one charged with crime.

Exceptions were taken during the trial to the refusal of the court to admit testimony as to the general bad character of the locality referred to in the article. The grounds of this refusal were, that as the plaintiff in error was only being prosecuted for the assault upon the integrity of the court, these other facts were collateral to the issue involved, and that if the evidence was offered merely to show a good motive for the publication, in mitigation of damages, then that the best evidence of such motive would be the testimony of the plaintiff in error himself. No error is perceived in this ruling, and it is believed to be correct.

While some of the instructions which were refused correctly propound the law, still this is no ground for reversal, because the same propositions of law were embodied in the instructions which were given by the court.

It is earnestly insisted by the counsel for the plaintiff in error that there is no sufficient legal proof that his client wrote the article, and that hence the verdict should be set aside. The proof is that he was the editor and had control of the editorial columns of the paper. In the absence of any denial of authorship

by him this is sufficient. American Digest (1893), 851, and cases cited.

In *Newell on Defamation*, page 239, it is said: "If the libel appear in a newspaper, the proprietor, the editor, the printer and the publisher are liable, either separately or together."

For the reasons above indicated the judgment of the County Court of Norfolk County will be affirmed.