# CRIMINAL COURT OF BALTIMORE CITY.

Filed June 1, 1926.

---

## STATE OF MARYLAND
### VS.

HAROLD ELLISTON, MANAGING EDITOR, BALTIMORE NEWS; EARL C. DELAND, MANAGING EDITOR, BALTIMORE AMERICAN; HARRY CLARK, CITY EDITOR, BALTIMORE NEWS; WM. STURM AND WM. KLEMM, PHOTOGRAPHERS NEWS AND AMERICAN.

---

*Jesse N. Bowen* and *William C. Coleman,* representing the Baltimore Bar Association.

*George Weems Williams* and *William L. Marbury, Jr.,* for defendants in contempt proceedings.

In re: Contempt Proceedings (State of Maryland vs. Richard Reese Whittemore) against Mr. Harold Elliston, managing editor of The Baltimore News; Mr. Earl C. DeLand, managing editor of The Baltimore American; Mr. William Sturm, reporter and photographer for The Baltimore News; Mr. William Klemm, reporter and photographer for The Baltimore American; and Mr. Harry Clark, City Editor of The Baltimore News.

O'DUNNE, J.—

There is one thought which I should perhaps express, and which in my remarks the other night I overlooked, and which I think in all fairness is due to each of these defendants in contempt citation. It is this:

The testimony of all defendants has been characterized by the utmost frankness and candor—without the slightest attempt, at any time, to either suppress the facts, or color the evidence. The profession of journalism might point with pride to this fact if it could be thought that it was due to habit begotten of long journalistic training! Personally I must attribute it to their own integrity rather than habits formed by their professional careers. Whatever the cause, the *fact* is at least commendable, and, if I may say so, *refreshing* in the Criminal Court. While admiring their candor, the boldness of their contention would challenge admiration except for the alarm that it creates in the attempted encroachment of the press on the undoubted rights of the courts to control those institutions in the protection of the public interests. The temple of justice cannot be commercialized for the benefit of International Reel Corporations, with world-wide distribution of pictures, and the dignified affairs of the legal forum must not be dragged down to the commerce of the street.

Courts must view with alarm the journalistic morals which find expression through Mr. Elliston, the managing editor of a great paper, *"that his duty to his readers and to his employer comes ahead of his duty to the courts of the land"*—without the protection of the courts, the acquisition of wealth is insecure. The journalistic policy was otherwise expressed by Mr. Clark, the city editor, that with knowledge of the Court's order prohibiting the taking of pictures in open court, *his* order to his journalistic staff was "to take the pictures anyhow and argue the legal question afterwards." I once heard President Roosevelt say the policy he decided on was to dig the Panama Canal first, and let the United States Senate argue the constitutionality of his act afterwards, and he naively added, "Our people now have the canal, and the Senate can still have its debate." In executive departments this may be well enough, where there is no antecedent *judicial* interdiction of the act—as was so in this case.

L. R. A.—1917 D—192, a recent decision of the Supreme Court of Florida, contains language which may be cited here, because it expresses more forcibly and more elegantly some of the same thoughts which were running in my mind at the close of the testimony in this case at the late session held last

Tuesday night, and to which I then informally and feebly gave inadequate expression.

I will therefore read a few paragraphs:

"It is true that respect to the courts is the voluntary tribute which the people pay to worth, virtue, and intelligence, and every man who has the honor to occupy judicial position in our government should strive to attain to that standard of judicial purity and efficiency which right-thinking people require of their judicial officers; but it is also true that malicious, designing persons may greatly impair the authority and efficiency of our courts by using the powerful arm of the press to scatter abroad suspicion and distrust by unfounded accusations against the intelligence, impartiality, integrity, and mental honesty of the judges of our courts of justice.

"Such accusations are an insult to the people whose agents the courts are; the injury accomplished is to the institution which the people by their government have established. The author and distributor of such publications, therefore, is an enemy to his people, a veritable traitor to his government whose protection he enjoys.

"Mr. Chief Justice English, in the case of State vs. Morrill, 16 Ark. 385, says: 'It was well remarked by counsel that no court could coerce public respect for its decisions; and we may add that no sane judge would attempt it. If it were the general habit of the community to denounce, degrade, and disregard the decisions and judgments of the Courts, no man of self-respect and just pride of reputation would remain upon the bench, and such only would become the ministers of the law as were insensible to defamation and contempt. But happily for the good order of society, men, and especially the people of this country, are generally disposed to respect and abide the decisions of the tribunals ordained by government as the common arbiters of their rights. But where isolated individuals, in violation of the better instinct of human nature, and disregardful of law and order, wantonly attempt to obstruct the course of public justice by degrading and exciting disrespect for the decisions of its tribunals, every good citizen will point them out as proper subjects of legal animadversion. * * * The court looks to the sober judgment of all reflecting and intelligent men, and to none with more confidence than the enlightened and liberal conductors of the press, who, as before remarked, have generally manifested a disposition to maintain public respect for the judicial tribunals of the country.'

"In the case of Watson vs. Williams, 36 Miss. 341, the Court said:

"In this country, all courts derive their authority from the people, and hold it in trust for their security, and benefit. In this State, all judges are elected by the people, and hold their authority, in a double sense, directly from them; the power they exercise is but the authority of the people themselves, exercised through courts as their agents. It is the authority and laws emanating from the people which the judges sit to exercise and enforce. Contempts against these courts, in the administration of their laws, are insults offered to the authority of the people themselves, and not to the humble agents of the law, whom they employ in the conduct of their government. The power to compel the lawless offender against decency and propriety to respect the laws of his country and submit to their authority (a duty to which the good citizen yields hearty obedience, without compulsion) must exist, or courts and laws operate at last as a restraint upon the upright, who need no restraint, and a license to the offenders, whom they are made to subdue.' * * *

"In the case of State vs. Frew, 24 W. Va. 416, 49 Am. Rep. 257, the Court said: 'We are well aware that the trust reposed in us to protect the people's courts from degradation is a delicate as well as a sacred trust. The power claimed, it is said, is arbitrary and liable to abuse. There is no reason why the power should not exist and be reposed somewhere. The few instances in which this power has been used during the last century shows that it was wisely placed, and may be safely left in the hands of the courts. It is well established by the authorities that the power is inherent in courts of justice to summarily punish constructive as well as direct contempts. And in this country, where the courts are, in the divisions of power by the Constitutions of the several States, constituted a separate and distinct department of government, clothed with jurisdiction, and not expressly limited by the Con-

stitution in their powers to punish for contempt, the inherent power that is thus necessarily granted them cannot be taken away by the legislative department of the government.' * * *

"As Judge Okey Johnson, of West Virginia, said: 'It is a matter of stern and inflexible duty from the performance of which under our official oaths we dare not shrink; for we well know that, as the ermine was spotless when we put it on, the people expect us to leave it as untarnished for our successors.'

"The profession of journalism is a great profession. It has enrolled in its membership some of the brightest minds in the history of our country. It has claimed men of the highest standard of integrity, indefatigable workers for the upbuilding of our common country and the establishment of our splendid institutions. They use the 'liberty of the press' as a means for the promotion of all that is good and noble among their fellowmen; they discuss in the columns of their publications public questions in a spirit of fairness, and always abhor and loathe the methods of those scandalmongers who traffic in sensational stories to their sordid profit. Our people have nothing to fear from the true journalist; our government and our institutions are safely guarded by them in the field of their labors. Nor has the freedom of the press anything to fear from the judiciary in this State. It may be said to the credit of the press in this State that, except in very few instances, it has upheld and maintained respect for the judiciary. But it is from the operations of the pseudo journalist that the people expect and receive injury and insult—that class, who, claiming the protection of that clause in our Constitution which provides that 'every person may fully speak and write his sentiments on all subjects' (Declaration of Rights, par. 13), dips his pen in the ink of morbid thoughts, and, with the recklessness born of irresponsibility, attacks the integrity and honor of governmental institutions and the characters of men and women with equal abandon, ignoring the admonition contained in the same section of the Declaration of Rights, viz., that they shall be held 'responsible for the abuse of that right' to speak and write their sentiments on all subjects. * * *

"Our government is one of laws. The exercise of any right secured by the organic law is always subject to the lawful rights of other persons in the premises, and especially is the exercise of a right by any person subject to the preservation of the governmental authority of the State as confered by law.

"It is of paramount importance that each department of our government should be protected and preserved against the attempt of designing persons to undermine its authority and destroy its efficiency. The executive branch of our government is charged with the duty of enforcing the law as made by the legislature and construed by the courts, yet the officers of that branch of the government, whose duties are largely, if not entirely, ministerial, are protected by law from interference with the discharge of their duties. The legislative branch, whose acts are subject to the courts' construction, has the power vested in it by constitutional provision to punish by fine and imprisonment any contempt committed in its presence, and so the courts, whose duty it is to construe the law and upon whom there is no check save the sovereign power of the people and the conscience, honor, ability, and mental honesty of the judges, have the inherent power to punish summarily any effort on the part of a citizen to destroy their authority and efficiency. As was said by this Court in ex parte Edwards, 11 Fla. 174: It is not to be denied (and the numerous authorities cited at the hearing by the counsel for the contestants abundantly establishes the position) that, in the absence of any statutory limitations or restrictions, the power of the several courts over contempts' is omnipotent, and its exercise is not to be inquired into by any other tribunal. This is the great bulwark established by the common law for the protection of courts of justice, and for the maintenance of their dignity, authority, and efficiency, and neither in England nor the United States has this unrestricted power been seriously questioned.' * * *

"The property, the liberties and lives of our citizens are rights which constantly are before this court for adjudication, and in any cause pending before this court the exhibition by the justices of ignorance, stubbornness, hos-

tility to any party to the cause of his representatives, unfairness, partiality, and partisanship would destroy the efficiency and authority of this court, bring it into contempt of the people, and prepare the way for breaches of the peace and possible bloodshed among our citizens. Is it reasonable to suppose that any man who has been honored by the people of his State with a position upon this tribunal is unmindful of the sacred trust reposed in him? Would any fair-minded, honorable citizen of this State, having the best interests of his government at heart, seek to destroy the dignity, influence, and efficiency of this court by imputing to the justices thereof infidelity to their trusts merely because a decision upon a point of evidence, admitted by opposing counsel before the court to be correct, happens to run contrary to the preconceived ideas and wishes of some interested spectators? Yet the defendants in this proceeding have, in a published article referring to a cause then pending in and being considered by this court, unhesitatingly laid at the door of our Supreme Court the charge of hostility to counsel, stubbornness, ignorance of the law, partiality, and partisanship. That charge, reduced to its last analysis, is nothing less than a charge of prejudice, partiality, and partisanship practised by the judges of this court in their official capacity, and if true, deserves the severest condemnation, and seriously impairs the efficiency and authority of this court. So long as this court is constituted of men who sincerely desire to administer justice according to the rules of law, it will jealously guard its integrity by purity of conduct, fairness, and impartiality in its decisions and the exercise of the best judgment which their abilities command. That judgment may not meet with the approval of self-appointed censors· of public morality and civic virtue, but when such persons so far ignore their loyalty to the government as to attempt the destruction of the efficiency of this court by imputing to its judges a lack of integrity and honest purpose, it will rebuke such conduct, to the end that the people may be protected from further insult and injury at the hands of such persons, that due respect for propriety and decency be maintained, and the dignity of the court vindicated from the disrespect shown to it. * * *

"Publishers of newspapers have the right, but no higher right than others, to bring to public notice the conduct of the Courts, provided the publications are true and fair in spirit. The liberty of the press secures the privilege of discussing, in a decent and temperate manner, the decisions and judgments of a court of justice, but the language should be that of fair and honorable criticism, and should not go to the extent of assigning to any party or the Court false or dishonest motives. There is no law to restrain or punish the freest expressions of the disapprobation that any person may entertain of what is done in or by the Courts. Under the right of freedom of speech and of the press the public have a right to know and discuss all judicial proceedings, but this does not include the right to attempt, by wanton defamation, groundless charges of unfairness, and stubborn partisanship, to degrade the tribunal and impair its efficiency. 6 R. C. L., pp. 254-512. 'Liberty of the press is subordinate to independence of the judiciary, and it is not expedient that any class in the community should be privileged to attack the courts with the view to interfere with the rights of litigants or to embarrass the administration of justice. Liberty of the press must not be confounded with license or abuse of that liberty.' 6 R. C. L., p. 510. * * *

"The conduct of unprincipled men, traducing the institutions of a State to the end that their political ambitions may be realized, is an unsafe guide for the young man who desires to succeed in the honored field of journalism, and is an example too degrading to be imitated, and too vicious to be condoned, by the self-respecting journalist. He cannot fan the flames of suspicion and distrust by printing a false article relating to a cause then pending in court, and imputing to that court a lack of integrity, without violating the law and transgressing every conception of decency. Newspaper editors and reporters have the right to publish the pleadings, proofs, and remarks of the court and counsel, yet they must see to it that they publish them truthfully and correctly. But they have no right to give publication to the impressions made by such court proceedings upon their minds, by the use with reference to the court itself of such con-

temptuous and opprobrious adjectives as that the court was 'partisan,' 'stubborn,' 'hostile to counsel,' and 'ignorant'."

And in re Independent Publishing Co., a decision by the United States Circuit Court of Appeals, 9 Circuit, L. R. A.—1917 E—710-12, the following language is used:

"The Statute (Ohio Rev. Stat., par. 5639) provided that 'a court, or judge at chambers, may punish, summarily, a person guilty of misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice.'

"This is almost the identical language of the Federal statute. The first question considered by the Supreme Court was whether the misbehavior of the plaintiff in error was in the presence of the Court. Upon that question, the court said: 'Indeed, it was written in the City of Cincinnati, though dated at Columbus. But the publication was in the court-room, as well as elsewhere. It was intended to have effect, and did have effect, in the Courthouse, at Columbus, and the writer was just as much responsible for that effect as though he had, in the Court-room itself, and while the trial was progressing, circulated and read aloud the article, or uttered the libelous words verbally. The acts were thus done, if not in the very presence of the court, at least so near thereto as to obstruct its business * * *. The statute clearly authorizes, as did the common law, courts to punish summarily, as contempts, acts calculated to obstruct their business. They could not be maintained without such power, nor could litigants obtain a fair consideration of their causes in a court where the jury or judge should be subject, during the trial, to influences in respect to the case upon trial, calculated to impair their capacity to act impartially between the parties.'

"The court answered that the principle 'will be found to be, not the purpose of protecting either the Court as a whole or the individual judges of the Court from a repetition of them, but of protecting the public and especially those who, either voluntarily or by compulsion, are subject to its jurisdiction, from the mischief they will incur if the authority of the tribunal be undermined or impaired.' * * *

"Liberty of the press is subordinate to the independence of the judiciary, and it is not expedient that any class in the community should be privileged to interfere with the rights of litigants or to embarrass or obstruct the administration of justice. 6 R. C. L. 510, par. 22."

So much for citation from authority. Now a further word.

As children, in the formative period of their moral character, are scandalized by the evil examples set by their elders and their betters, so are infant newspapers in a community affected in the tone of their journalistic work by the evil example of their elders and their betters.

The evil consequence of bad example is aptly illustrated in this case by the editorial of the "Post" read into the record for that purpose by Mr. Bowen toward the close of the case (or so much thereof as bore upon that question) namely, that the only reason that they did not print the picture in defiance of the court order, was that they did not attach sufficient importance to its *news'* value to inspire them to flaunt the court's order. It is even questionable in my mind whether a wide-spread editorial statement of that character is not *actually* more subversive of the wholesome respect due courts, *as institutions*, than the actual publishing of the picture, *unaccompanied* by such statement. The latter act might, in most cases, pass as an *unknown* defiance of judicial authority:—Whereas the former carries with it the evil effect of premeditated, deliberate, contemptuous disregard of judicial authority.

To what extent the morals of youthful journalistic enterprises in our community are being rapidly contaminated, is equally illustrated by another editorial in the same evening penny "Post," appearing a very few days ago. This journalistic organ, disappointed in the recent decision of our Associate, his honor Judge Frank, in upholding the United Railways easement valuations at a certain figure, expressed the hope that, on appeal of the case, they would be fortunate enough to find a court *"less corporation-minded."* The imputation there is plain; *the consummate insolence*, appalling!

Whether such editorial comment is contempt of court under the estab-

lished decisions, is not a question on which I am called to pass in this case. That it is the kind of *actual* contempt (as distinguished from the use of the term in the technical *legal* sense) which has, *in fact*, a tendency to undermine the public confidence in the institutions of Courts, I have no doubt. It strengthens the growing tendency, in an age of irreverence for all things, to undermine the public confidence in judicial tribunals. When contempt for *law*, and contempt for *judicial authority*, become *general and wide-spread*, thereafter our American institutions cannot long endure.

Because of the importance of the public question here presented, and because of the bold manner in which the authority of courts as institutions, is definitely challenged and the usurpation of authority by the press sought to be substituted for the exercise of judicial discretion of the courts in controlling the decorum of legal tribunals when engaged, as it was in the most serious undertaking of the trial of a notorious bandit, since convicted of murder in the first degree, I would be recreant to the trust imposed in me as the temporary incumbent of the OFFICE OF JUDGE, if this public challenge of the authority of the tribunals of the people was not *fearlessly met*, and *firmly disposed of*, in the public interest.

On the record in this case, I have not the slightest hesitation in adjudicating:

(1) That the acts in question, as to each defendant cited, constitute contempt of court.

(2) That each of the five defendants cited, is guilty of contempt of court, and I so adjudicate.

The sentence of the Court as to each of the defendants, Wm. Klemm, William Sturm, Earl C. DeLand and Harry Clark, is ONE day in the Baltimore City Jail.

As to Harold Elliston, the managing editor, the sentence is one day in jail and a fine of five thousand dollars.

The theory of my sentence is about this:

That all of these defendants are but the product of a journalistic system which looks upon its conception of duty to its employer and its reading public, as above the law.

The person highest in authority in this jurisdiction to whom the trail of personal responsibility leads as far as disclosed by the record in this case, is Mr. Harold Elliston the managing editor of the Baltimore News, one of the Hearst Newspapers in this community. They are but the product of a system. As the dignified affairs of the legal forum were shifted to the commerce of the street for the benefit of the Hearst International Reel Corporation—with its world-wide picture distribution, it may not be too much to expect that the "*system*" and the "*syndicate*" of which they are but the local operators, will pay the fine, and in that way, commercialism will be robbed of its chief incentive to make profit out of the administration of justice in defiance of the orders of the Court.

Both the Bar Association and the learned counsel for the defendants have submitted me some authorities on the question of appeal. I am inclined to the view expressed in the Kelly case in 141 Maryland, that a criminal contempt of this character is not appealable, and because I think that my sentence in this case is in fact final. I am for that very reason, constrained to make the imprisonment nominal, rather than substantial which it would be if I were definitely satisfied that the defendants had right to review the exercise of my discretion. I am devoid of all personal resentment or vindictiveness in the matter, and have no other idea than a determination to merely vindicate the authority and dignity of the Court, as an institution of the people, ordained by them for their own protection. I therefore feel that in this case, under the circumstances, it can as well be accomplished by one day in jail, as by several months, which I would otherwise have imposed.

What we now want to accomplish is something CONSTRUCTIVE for the future. We aim at future co-operation of the press as a most valuable public agency of a private nature which is capable of great work in promoting the public interest in the general administration of Justice. Mr. Bowen and the public interest in the general administration of Justice. Mr. Bowen and Mr. Coleman representing the Baltimore Bar Association have, as I understand it, suggested a conference between the Bar, the Bench and the press looking to a more detailed plan

of operation for the future, in which the rights, necessities and limitations of each can be more carefully examined and determined. A general spirit of co-operation may well result from such a conference. No one entering such conference will be asked or expected to surrender any of his rights. The wisdom of the *exercise* of rights, is always a question to be determined by the sound discretion of the person possessing such right. That is the principle I have applied in this case.

In closing these remarks, I should perhaps also say that the newspapers represented herein their management by these defendants have, since the institution of these contempt proceedings, published fully the entire accounts of the proceedings, published fully the entire accounts of the proceedings with an impartiality which is *admirable*. This only further demonstrated how fairly great newspapers *can* be operated, when there is a disposition of the managers so to do.

While I do not believe the case is appealable, the defendants are represented by counsel eminent in the profession. These learned gentlemen entertain a different view of the law. They may be right, and I may be wrong. It would ill become me to deny them *opportunity* to even reach a legal forum where that question may be determined. It is an axiom of the law, that every man is entitled to his day in Court. I think they have had theirs. They think they are still entitled to another. They should, or at least will be, by me accorded that *opportunity* for determination. Upon entering order of appeal they will be admitted to bail on their own recognizance as to the jail sentence, and be required to give a supersedeas bond as to the payment of the fine—which bond they may arrange later in the week, at their own convenience, within the week in which the order of appeal is filed.

In the prosecution of the appeal, if it should be decided on appeal, that they have no right of appeal, then, in that case, I sincerely hope that the Court of Appeals will also indicate whether in its judgment they are guilty of contempt of Court, irrespective of the technical question of whether they have the right of appeal. If, in the event of the denial of the right of appeal, the Court should indicate that the acts do not constitute contempt of Court, or that this Court is or was without authority to pass the order made the basis of this contempt proceedings, then I will reconsider and strike out the sentence and strike out the verdict, if such power to right a wrong still exists in a judicial tribunal. Certainly power to right a wrong ought to exist in any judicial tribunal committing one. This is at least indicative of my disposition on the premises.