THE PEOPLE *v.* ABRIL.

PROCEEDINGS for contempt.

No. 1.—Decided June 20, 1905.

CONTEMPT—PUBLICATION OF FALSE OR INCORRECT STATEMENT OF JUDICIAL PROCEEDINGS.—The wilful publication of any report, which is false or manifestly incorrect, relating to a judicial proceeding constitutes the crime of contempt in accordance with subdivision 5 of section 1 of the Law of March 1, 1902.

The facts are stated in the opinion.

*Mr. Rossy, fiscal,* for The People.

*Mr. Vias Ochoteco* for defendant.

Mr. JUSTICE HERNÁNDEZ delivered the opinion of the court.

This is the first case of its kind, contempt of this Supreme Court, submitted to the original jurisdiction of the same. In the newspaper *La Democracia,* in the issue numbered 4052, under date of April 7th of this year and under the title: "The Toa Baja Affair.—Evident electoral triumph lost through the inactivity of the Supreme Court.—It is high time. The petition of the Unionist attorney is sleeping because the judge charged with delivering the opinion fails to decide the matter," there was published an article which literally transcribed reads as follows:

"*The Toa Baja Affair.*—Evident electoral triumph lost through the inactivity of the Supreme Court. It is high time. The petition of the Unionist attorney is sleeping because the judge charged with delivering the opinion fails to act in the matter.

"To the Supreme Court of Porto Rico, which is the highest judicial tribunal in this country, *La Democracia* has always shown the highest respect, and it will continue so to do.

"But the Unionist Party has interests which it must defend at any cost, and the Unionist press would be criminal if it abandoned the interests of its party.

"At Toa Baja our party won by a majority of votes. And in view of that victory our adversaries had recourse to the most ridiculous tricks, availing themselves of their *two to one* on the election board and annulling 108 ballots for the simple, very simple reason that the crosses did not reach the line of the circles which are at the top of the ballots.

"Such a coarse and foolish trick could not prevail, and Mr. Benitez Castaño filed in the Supreme Court an application for the writ of mandamus, upon the result of which remedy depends whether or not the Executive Council will open the packages in order to examine the ballots that have been annulled, and give the victory to the party that won the same in a fair contest.

"Days, weeks and months go by.

"On the 20th instant the appointments will be made according to the majority appearing in the precincts of each municipality which has been segregated.

"And Toa Baja will have a Republican municipal council instead of having, as is just, a Unionist municipal council.

"The judge who has the case is Mr. José Conrado Hernandez. The decision of the matter is delayed by him. And we ask, since the matter involved is a most urgent one which affects the life of a people, that less inactivity be shown and that the opinion be rendered without delay, and that the package be opened and that it be stated whether the ballots in question are null or whether they are valid.

"This is our first signal to be on the alert. We hope that a second signal may not be necessary."

As in the said article it is maliciously affirmed that this Supreme Court has not yet disposed of the application for *mandamus* made by Attorney Benitez Castaño against the Executive Council, it was brought to the attention of the *fiscal* of this court, in order that he might proceed in accordance with the law approved March 1, 1902, defining the crime of contempt and providing for the punishment thereof; and the *fiscal* filed an information against Mariano Abril, manager of the newspaper *La Democracia,* because he considered that said article constituted the voluntary publication of a false report of the judicial proceedings had before the Supreme Court in the said *mandamus* proceeding, which was decided with the dispatch required by its nature and in compliance with its official duties by the court, which case comes under subdivision 5 of section 1 of the aforesaid law.

A day having been set for the accused, Don Mariano Abril, to appear and defend himself against the charge, he appeared before this court accompanied by his counsel, Juan Vias Ochoteco, and declared that Luis Muñoz Rivera, the editor of the paper, was the author of the article referred to, but that as the manager of the said newspaper he was responsible for the article because it appeared without any signature; and he alleged in his defense that the said article was not published with any intention of offending the Supreme Court, but with a view to securing a decision as soon as possible, it having been published after a complaint was made to the

newspaper *La Democracia* by Attorney Benitez Castaño, to the effect that the court had not yet decided the *mandamus*.

From the evidence taken it appears that in the issue of the same newspaper *La Democracia,* No. 4041, under date of March 25th last, the said Attorney Benitez Castaño, in an article entitled "Elections in Toa Baja," over his signature made the definite assertion that the Supreme Court had not disposed of the application for the writ of *mandamus* prayed for against the Executive Council, the said Benitez Castaño testifying that several times he had asked in the office of the secretary of the Supreme Court, Eugenio Alvarez, the assistant secretary, whether the same had been decided; in regard to which matter Alvarez stated that he had no knowledge as to whether or not a decision had been rendered in the *mandamus* case, and the secretary of the court, Antonio F. Castro, testified that the decision had been rendered on the 25th of February and that Benitez Castaño had not come to him to ascertain whether or not the decision had been rendered therein.

On these facts the *fiscal* spoke in support of the information and counsel for Abril made such allegations as he deemed proper in defense of the accused, protesting that he had not intended to offend the court.

In accordance with the law of the Legislative Assembly, approved March 1, 1902, the crime of contempt of a court or tribunal is committed, among the other acts mentioned in section 1 of the said law, by the voluntary publication of any false or grossly inaccurate report of judicial proceedings.

The report published in the same issue, No. 4052, of the newspaper *La Democracia,* under date of April 7th of the present year, in regard to the proceedings had in the matter of the application for *mandamus* filed in this Supreme Court by Attorney Benitez Castaño, is false in every respect, since the case was decided on the 25th of February by this court denying the application, and consequently it is also false that

it was the fault of the judge having charge of the case that the matter had not been disposed of.

The article in *La Democracia* on which the information filed against Abril is based falls fully within the provisions of subdivision 5 of section 1 of the law of the Legislative Assembly, approved March 1, 1902, inasmuch as it was published in absolute and definite terms without the slightest showing of doubt in regard to the course of the *mandamus* proceeding; and in this manner the false report, that this court was delaying the decision of a matter submitted for its determination, was widely circulated.

We recognize the principle that in every free government the courts of justice are created and maintained not for the benefit of those who discharge the duties of the offices, but for the benefit of society and the protection of the people in the enjoyment of their rights; but we also believe that in order to attain the high purpose for which they were created, it is necessary that they be respected and that they be free from unjust attacks tending to promote a lack of confidence on the part of the public, which should see in such courts the guardians and defenders of its rights.

The liberty of the press is not restricted by this doctrine, because that liberty is one thing and the abuse of the same is another.

But in the present case the court should abstain from imposing any punishment upon Mariano Abril, taking into account the fact that the publication of the article in question was brought about by false information given by Attorney Benitez Castaño, and that Abril himself has protested that it was not his intention to offend the court. We are also constrained so to decide this case by reason of the fact that this is the first case of contempt submitted to the consideration of this court, that the contempt committed is not of a serious nature and that it being a matter which is new

to the legislation in this Island, it is easy to believe excusable that which was illegal; and we say this because a newspaper editor should have knowledge of and be conscientious in what he publishes, and should not place confidence in reports which he cannot absolutely prove to be true when such reports constitute attacks upon the courts.

For the reasons stated, and taking as a precedent the final judgment of the Supreme Court of Colorado, in the case of *People of the State of Colorado ex rel. Chas. Connor* v. *William Stapleton et al.*, 23 L. R. A., 787, we are of opinion that in this case all further proceedings are unnecessary, and that no punishment whatever should be imposed upon Mariano Abril.

*Discharged.*

Chief Justice Quiñones, and Justices Figueras and Wolf concurred.

### DISSENTING OPINION OF MR. JUSTICE MACLEARY.

Not being able to agree with my colleagues, either in the proceedings taken or the opinion rendered or the decision made in this case, I feel obliged to place on record the reasons which impel me to dissent. In doing so it will become necessary to advert to the propositions announced in the opinion and the reasons therein given for the action of the court, as the judgment declares that they are the basis of the resolution taken to dismiss the proceedings without imposing any punishment upon the accused. If it were possible to do so, I would prefer to give my own views without reference to those expressed in the opinion of the majority of the court, but the manner in which these matters are set forth and the nature of the case renders this course altogether impracticable. Any reference which is made to the views of the action taken by my colleagues is intended to be entirely impersonal.

This is a prosecution against Mariano Abril, manager of the newspaper called *La Democracia,* for contempt of court

in making a false publication in said periodical on the 7th day of April, 1905. The said article, appearing in No. 4052 of Volume XV, under date of the 7th of April, 1905 reads as follows:

"*The Toa Baja Affair.*—Evident electoral triumph perhaps lost through the slowness of the Supreme Court. It is high time. The appeal of the Unionist attorney is sleeping because the judge *ponente* does not despatch the matter.

"To the Supreme Court of Puerto Rico, which is the highest representative of justice in this country *La Democracia* has .always shown marks of the highest respect. And it will continue to show the same to said court.

"But the Unionist Party has interests which it must defend at. any cost, and the Unionist press would be criminal, if it abandoned the interests of its party.

"At Toa Baja our partisans won by a majority of votes. And in view of that triumph, our adversaries had recourse to the most ridiculous tricks, availing themselves of *their two to one,* in the election boards, and annulling 108 ballots for the simple, very simple reason,. that the crosses did not reach the line of the circles which are at the head of the ballots.

"Such a coarse and foolish trick could not prevail. And Mr. Benitez Castaño presented a petition for a writ of *mandamus,* before the Supreme Court, upon which remedy it depends whether the Executive Council will open the packages, in order to examine the ballots that have been annulled, and to give the victory to the party who has won the same in a fair contest.

"Days, weeks, months go by.

"On the 20th instant the appointment will be made according to the majority appearing in the precincts of each municipality that has been separated.

"And Toa Baja will have a Republican town council, instead of having as is just a Unionist town council.

"The *ponente* is Mr. José Conrado Hernandez. The decision of the matter is delayed by the *ponente.* And we demand since the matter involved is a most urgent one which affects the life of a people, that less passiveness be shown, and that the opinion (in the said matter) be rendered without delay, and that the packages be opened, and that it be said whether the ballots in question are null, or whether they are valid.

"This is our first signál to be on the alert. We hope. that a second signal· may not be necessary."

On· the 8th of April of the present year this newspaper report was brought to the attention of the Supreme Court by the Ponente mentioned therein, and thereupon an order was made by the said tribunal referring the matter to the *fiscal,* and commanding him to take such proceedings as were provided by law.  On the 11th of April the *fiscal* of the Supreme Court presented against the defendant Abril the following accusation:

"In the name and by the authority of The People of Porto Rico. *The People of Porto Rico.* v. *Mariano Abril.*  In the Supreme Court of Justice of Porto Rico.  Accusation for contempt.

"The *fiscal* of this Supreme Court presents an accusation against Mariano Abril, director of the newspaper *La Democracia,* for the offense of contempt of this Supreme Court of Justice, provided for in paragraph 5 of section 1 of 'An Act defining the offense of contempt of court and providing for the punishment thereof,' passed by the Legislative Assembly of Porto Rico and approved the 1st of March, 1902, committed in the following manner:

"On or about the 4th day of February, 1905, the attorney Eugenio Benitez, in the name of Lucas Luis Velez and others, presented before this Supreme Court a petition for the writ of *mandamus* against the Executive Council of Porto Rico, so that the same might be ordered to open certain bundles of ballots in· its possession, which had not been counted by the election judges of various precincts of the Toa Baja jurisdiction, corresponding to the municipal district· of Bayamon, and which ballots had been cast, as the petitioner states, in favor of the party known as *Unión de Puerto Rico* at the general election held on the 8th day of November, 1904.

"That on the 9th day of February, 1905, the Honorable Chief Justice of this court issued an order to the Executive Council of Porto Rico, and in representation thereof to the Honorable Regis H. Post, as president, commanding him to show cause if any there might be, why the writ of *mandamus* applied for should not issue.

"That on the 15th of February of the present year the Assistant Attorney General and the undersigned *fiscal,* representing the Executive Council, asked the court to deny the said petition for the reasons set out in the writing presented for that purpose.

"That on the 25th of February, 1905, the court decided this case, refusing to issue the writ of *mandamus* applied for, and which decision, signed by the Honorable Justices Quiñones, Hernandez, Mac-Leary and Wolf, was of course final, and remained in the hands of the secretary at the disposition of any one desiring to ascertain the result, as we, the lawyers for the Executive Council did.

"That notwithstanding this decision, the newspaper *La Democracia,* which is edited in this city, Island of Porto Rico under date of April 7th, 1905, of which the said Mariano Abril is the director, on its third page, under the heading 'The Toa Baja affair. Evident electoral triumph perhaps lost through the slowness of the Supreme Court. It is high time. The appeal of the Unionist attorney is sleeping because the judge *"ponente"* does not despatch the matter.' published an article from which the following paragraphs are taken:

" 'Such a coarse and foolish trick could not prevail. And Mr. Benitez Castaño presented a petition for a writ of *mandamus,* before the Supreme Court, upon which remedy it depends whether the Executive Council will open the packages in order to examine the ballots that have been annulled, and to give the victory to the party who has won the same in a fair contest.

" 'Days, weeks, months go by.

" 'On the 20th instant the appointments will be made according to the majority appearing in the precincts of each municipality that has been separated.

" 'And Toa Baja will have a Republican town council, instead of having, as is just, a Unionist town council.

" 'The *ponente* is Mr. José Conrado Hernandez. The decision of the matter is delayed by the *"ponente."* And we demand since the matter involved is a most urgent and one which affects the life of a people, that less passiveness be shown, and that the opinion (in the said matter) be rendered without delay, and that the packages be opened, and that it be said whether the ballots in question are null, or whether they are valid.

" 'This is our first signal to be on the alert. We hope that a second signal may not be necessary.'

"That such article constitutes the voluntary publication of a false report of the proceedings prosecuted before this Supreme Court in this case, which was decided with the promptness required by the nature of the same, and the compliance with its official duties by the court, this act being contrary to the law for such case provided and against the peace and dignity of The People of Porto Rico.—Signed: José M. Rossy, *fiscal del Tribunal Supremo.*

"The foregoing accusation is based on the personal knowledge which I have of the facts, by a reading of the newspaper referred to, which has been sent to me by the court, together with the order to proceed in accordance with the law of the Legislative Assembly passed on the 1st of March, 1902, defining the offense of contempt of court, and providing the punishment therefor.—Signed: Jesus M. Rossy, *fiscal* of the Supreme Court.

"Sworn and subscribed before me this 11th day of April, 1905.— Signed: A. F. Castro, secretary of the Supreme Court."

Abril failed to file an answer, as he was commanded to do, showing cause why he should not be punisheed for contempt, nor did he present any other pleading whatever. However, he appeared at the oral trial, which was had on the 17th of April in open court, and testified among other witnesses. Why he was not required to file an answer or exceptions to the accusation the writer is not informed.

And in addition to this the accused, being in default, should have been required to give a bond for his appearance from day to day until discharged by the decision of this court. No bond was required of him pending the consideration of this case, which lasted over two months, nor was he detained even in nominal custody; and after the matter was submitted to the court, and prior to its decision, it has become generally known in this city, and in the Island, that he has quit Porto Rico and emigrated to the continent, so that even had the judgment of this court been against him, he would have been beyond its jurisdiction, and the judgment could not have been executed without extradition. The entire proceedings in this case at bar appear to have been conducted in a very loose manner emphasizing the fact that the procedure in cases of this kind is as yet not very well settled or understood in this jurisdiction. Why this was permitted I am unable to understand. These circumstances are merely mentioned to show that some definite practice in contempt cases should certainly be adopted without further delay.

On the trial the following testimony was introduced and

is condensed from the report of the stenographer, who took down the testimony on the trial and filed his report herein with the secretary shortly afterwards. A faithful abstract of the testimony reads as follows:

"The *fiscal* offered in evidence on behalf of the State, first, The article on which the prosecution is based, and which has been heretofor copied, and second, The testimony of Antonio F. Castro, the secretary of this court, which was as follows: That a petition for a writ of *mandamus* was presented in this court by the lawyer Eugenio Benitez Castaño; that the said matter was decided on the 25th of February of the current year; that he is not aware whether Mr. Benitez came to ascertain what was the decision after the 25th of February of this year, that he did not apply to him in person; that there is a decision of this court which abolished the practice of notifying (parties of the result of their suits); that the said decision and order were published and sent to district courts and the municipal court where they were posted for the information of the public.

"In reply to questions put by defense the witness testified that the said resolution states that parties shall make inquiries in the office of the secretary. The counsel for the defense proposed that the accused be examined as a witness, also Mr. Eugenio Benitez, and the article of the newspaper under date of the 25th of March be admitted as evidence.

"The *fiscal* requests that he be allowed to put another question to the secretary, and the latter in reply thereto answered that he had received absolutely no complaint from any one to the effect that the employes in his office had refused to inform, or of having incorrectly informed Mr. Benitez, or any other person interested in this case, in regard to the status of the same.

"Mr. Abril, after having been informed by the court that he was not obliged to testify, but that if he did so it would be under the responsibility of the oath which he had taken, and such testimony could be used against him in any proceedings against him, or against any other person, testified that on April 7th an article was published in the *Democracia* in regard to the *mandamus* in question, that the same was published after a complaint had been made at the office of the *Democracia* by Mr. Benitez Castaño to the effect that the *mandamus* had not been decided and that the failure to decide the same prejudiced his interests. That they tried on several occasions to ascertain the status of the case before mentioning the matter in the

press, and the article of the 25th was published in the *Democracia*, which said that the *mandamus* which was pending before the Supreme Court had not been disposed of; that they were later advised by Mr. Benitez that the matter had not been dispatched, and that it was then that the (second) article was published asking that the case be decided as soon as possible; that it was not the intention to offend the court, but it was published in order that the case might be decided as soon as possible. The accused further testified that he did not write the article himself, but that he was the director of the newspaper, and as such responsible for anything appearing therein without signature; that Luis Muñoz Rivera, the editor of the paper wrote the article.

"Benitez Castaño after being sworn as a witness testified in substance, as follows: That he had made application for the writ of *mandamus* in this court; that after the 25th of March he was in the office of the secretary several times to ask in regard to the decision; that he did not ask the secretary personally, because he always found him in court, but that he asked Mr. Alvarez several times, and the latter told him that he did not know whether it had been decided; that on the strength of what Mr. Alvarez had replied, on the 25th of March the (first) article was published in the *Democracia*; that Mr. Alvarez did not state definitely that his case had not been decided, that he then made the statement in the office of *La Democracia*, that in his belief the case had not been decided.

"To the question put by Judge Hernandez, Mr. Abril replied that he did not publish any explanation or correction in the newspaper after his notification of the decisions of the Supreme Court, because he had not been answered with certainty in regard to the matter.

"The article which appeared in *La Democracia* under date of March 25th, and which was admitted in evidence was ordered read by the court; it is as follows:

" 'The Toa Baja elections. Mr. Benitez Castaño triumphantly discusses the resolutions of the Executive Council. Legal texts. Shameful impunity for political crimes. We have stated heretofore that the Supreme Court can order, and the Executive Council can make an inspection of the package of ballots illegally excluded by the Republican judges in the Toa Baja precincts. These judges had no authority to admit or exclude those ballots at their discretion. It was their imperative duty, a duty imposed by law, to count them as valid votes. In this very extraordinary case, an exact example of which we have been unable to find in any of the works and legal

texts which we have read, it is not possible to require the election judges of Toa Baja to meet again and count the votes which, on account of the bad faith of our adversaries and the absolute lack of respect for the ballot, were taken away from the Union Party of Porto Rico. It is not possible to pretend to such a thing, because the ballots referred to are not under the control of those judges. They are in the custody of the Executive Council. This point is clearly decided in the L. R. A. on page 740.

" 'The object of the writ of *mandamus* is to prevent the defeat of justice. (Wood on *Mandamus,* page 34.) And this would be a case where justice was defeated, if a remedy is not afforded in the manner sought by the interested parties.

" 'In the case of *Ellis* v. *County Commissioners,* it was decided that the writ of *mandamus* could be employed to compel a board of revision to certify that the applicant had received a majority of votes cast for a public office, although the certificate of election for that office had already been issued to another person.

" 'The state board of canvassers may be compelled by means of the writ of *mandamus* to rectify the apparent result of the election, failing to count illegal votes which had already been counted by the county board. (L. R. A., Book 14, page 624.) We do not wish that illegal votes shall not be counted, but that perfectly valid votes be counted, but the legal doctrine applicable to the case is the same.

" 'When the election returns contain a result which is illegal and erroneous, made by a county canvassing board, which has exceeded its authority and failed to comply with its duties, if such result could alter the true result of the election, the writ of *mandamus* is an effective remedy for the state canvassing board to disregard those documents, although ostensibly they are proper and valid. (L. R. A., Book 14, page 643.)

" 'When a case involves the title or right to a public office, the legal proceeding generally used is the *quo warranto*. Then the writ of *mandamus* does not lie, except in very rare cases. But this is not the question under discussion. Certain it is that when this question is decided it will be definitely established who are entitled to the municipal offices of Toa Baja, the Unionists or the Republicans.

" 'The application for the writ of *mandamus* made to the Supreme Court is based on the sworn statements of the two election judges representing the Union of Porto Rico in the precincts of that town. Those judges swear to a concrete fact; that our adversaries failed to count 108 ballots legally cast in favor of our party, because the cross made in the circle did not extend to the lines of the circle.

So here a dilemma presents itself; either the Unionist judges are guilty of perjury, or the Republican judges openly failed to comply with the law.

" 'The ballots themselves will be the most eloquent proof. It is urgently necessary that they be examined so that falsehood may not prevail, so that the trampling under foot of the purity of the ballot may not be tacitly sanctioned.

" 'If justice and law are taken into consideration the case is very simple. Difficulties may be put in the way of the action by *tiquis miquis*, technicalities of the law and judicial decisions which are not uniform; but if this should happen, if the *mandamus* should be held not to lie, do not think for one instant that this matter, in which we are actuated by the utmost sincerity, will remain in darkness. The light will come at all events.

" 'In the judicial debate which we have taken part in, on account of the elections in Toa Baja and other towns, the courts have not said their last words. The Supreme Court has not yet decided the mandamus applied for against the Executive Council. We await its decision. Neither has the Attorney General rendered any opinion whatever on several *quo warranto* applications, which we have made. We also await his decision. And in order to stimulate him to do so, in order that he may not look with indifference, as Mr. Sweet, on claims of such great importance and interest for the Porto Rican people, we will work up his zeal by way of letters which shall see light in this periodical.

" 'If it should unfortunately occur that all efforts to preserve the purity of the ballot and the legality of election, should prove futile, we would be forced to the sad conclusion that the violators of the law, when citizens are casting their votes, can count on the most shameful impunity.—(Signed)   E. Benitez Castaño.'

"Eugenio Alvarez, assistant secretary of this Supreme Court, was examined as a witness, and stated that he had been asked by Mr. Benitez in regard to the mandamus, explaining that Mr. Benitez came to the office, and as was customary with him, first went to Mr. Marin, who it appears directed him to go to Mr. Alvarez, and that upon so doing Mr. Benitez asked whether the mandamus against the Executive Council had been decided; to which question the witness replied that he had not been advised whether the decision had been rendered or not, and only had in his possession a copy of the answer filed by the Executive Council, which the witness handed to Mr. Benitez at the time that he did not tell Mr. Benitez definitely that the case had not been decided; that he can be unaware of a decision of the court

without failing in the compliance of his duties, because many times the decisions are delivered directly to the secretary, who attends to them in conjunction with the clerks in the office, and in those cases he could learn nothing of the decision until a copy of the same was delivered to him to attach to the record and communicate to the district courts; that after the secretary, he is the oldest employe and the next in authority in the office of the secretary of the Supreme Court."

This closes the testimony given on the trial. The court took the matter under advisement and continued a consideration of the same at intervals from day to day from the 17th of April until the 20th of June of the present year, and thereupon made an order dismissing proceedings against the defendant Abril, without imposing upon him any punishment whatever; for the reasons expressed in the opinion which was filed at the same time.

With a part of the opinion of the court, prepared by Mr. Justice Hernandez, I heartily agree. That is to say, with the following paragraphs, to wit:

"According to the law of the Legislative Assembly approved on the 1st of March, 1902, the offence of contempt committed against a court or tribunal, is committed, among other acts set forth in section one of said law, by the wilful publication of any false or grossly inexact report of judicial proceedings.

"The report published in the said number 4052 of the newspaper La Democracia, issued on the 7th of April of the current year, in regard to the proceedings had in connection with the writ of mandamus requested before this Supreme Court, by the attorney, Benitez Castaño, is false in every way, inasmuch as since the 25th of February, the court had decided the said case, declaring that there was no reason for issuing the writ of mandamus, and consequently it was false that through the fault of the judge ponente (having the matter under consideration) the decision of the matter was delayed.

"The article in La Democracia, which caused the accusation of Abril, comes fully within paragraph 5 of section 1 of the law of the Legislative Assembly, which was approved on the 1st of March, 1902, for it was published in absolute and categorical terms, without the slightest sign of doubt with regard to the course of the proceeding of mandamus, and in such form it was put in circulation, propagating

the false news that this court was delaying the decision of a matter which had been submitted to it for its consideration.

"We recognize the principle of every government that the courts of justice are created and sustained, not for the benefit of those who discharge the duties of the same, but for the benefit of society, and the protection of the people in the enjoyment of its rights; but we also believe that in order to fulfill their high mission, it is necessary that they be respected, and that they be free from unjust attacks which inspire the public with distrust and suspicion, while the public should see in them the guardians and defenders of their rights.

"The liberty of the press is not opposed to this; for the said liberty is one thing, and the abuse of the same is another."

But I cannot concur in the conclusion at which the court arrived from these premises, namely, that the court should abstain from imposing any penalty whatever upon Mariano Abril. The reasons given by the court for exculpating the accused are: First, that the publication of the article referred to was caused through false information furnished by the attorney Benitez Castaño; and second, that Abril himself protested that he had no intention to offend the court; and third, that his is the first original case of contempt of court which has been submitted to this tribunal for its consideration; and fourth, that the contempt committed has no grave characteristics; and fifth, that the said offense being a new matter in the legislation of this Island that which was illegal may be easily believed to have been excusable.

The first of these excuses is answered by the opinion itself, which goes on, immediately after the expressions mentioned, to state "that the act was illegal because the journalist must have full and positive knowledge of what he publishes, and not rely, when he is going to attack the courts, upon reports the truth of which he cannot fully prove." Certainly if this statement is correct, and I agree with it entirely, the false information furnished by the attorney cannot be considered as justifying the article. And even aside from the reason given, Benitez Castaño in giving this information was acting as the agent of the accused, and of course

the latter is responsible for any errors fallen into or misstatements made by his said agent. Trusting in statements made by others he does so at his peril. The records of this court are public, and he had the right to consult them had he so desired. He could have conferred with the secretary, in his office or by telephone, and easily have ascertained the facts in regard to the whole matter. He did not trouble himself to search after truth. Wilful ignorance cannot justify gross falsehood.

In cases of contempt, ignorance neither of law nor of fact is an excuse for the offense; the reason for punishment in such cases is not only for the sake of the injured party but also on account of public proceedings in the court; one of the main objects being to hinder such publications, which have a tendency to prejudice the public mind in regard to matters under consideration by the judicial tribunals.

(See cases reported in English Chancery Reports, 2 Atkyns, 471; 2 Vesey, 520; 1 Peere Wms., 675; and approved by our writers). (4 Blackstone's Commentaries, 262; *Republic v. Oswald*, 1 U. S. [Dallas], 329 *b*).

The second excuse is not founded in fact. Abril made no answer in this case, under oath or otherwise, nor did he make any protest in writing or verbally. He merely stated in his testimony in reply to questions by his attorney, that he had no intention to offend the court, but that his object was to secure as early a decision as possible. This statement varies materially from the article itself.

The Supreme Court of the United States has announced the proposition, which was already well established, that proceedings in contempt are not in execution of the criminal laws of the land; that penalties imposed therein are no substitute for, and no defense to, a prosecution for any criminal offense committed while incurring the penalties of contempt of court. They are entirely distinct. (*In re Debs*, 158 U. S., 564.)

In this celebrated case Mr. Justice Brewer, on page 596, further says:

"A court enforcing obedience to its orders by proceedings for contempt, is not executing the criminal laws of the land, but only securing to suitors the rights which it has adjudged them entitled to."

He refers in support of this proposition to the following cases from some of which quotations are made in his opinion, to wit: *The Earl of Shaftesbury's case,* 2 St. Trials, 615; *Watson* v. *Williams,* 36 Miss., 331; *Cartwright's case,* 114 Mass., 230; *United States* v. *Hudson,* 7 Cranch, 32; *Anderson* v. *Dunn,* 6 Wheaton, 204; *Robinson ex parte,* 19 Wallace, 505; *Mugler* v. *Kansas,* 123 U. S., 623; *Eilenbecker* v. *Plymouth County,* 134 U. S., 31; *Interstate Com. Comm.* v. *Brimson,* 154 U. S., 447; *Terry ex parte,* 128 U. S., 289.

It matters not what the intentions of the accused were. It is not necessary in a case of this kind that the accused should have a criminal intent. Section 11 of the Penal Code of Porto Rico has no application whatever to this proceeding or others such as this. The contemnor is not answering to an indictment, nor is this a prosecution for a crime. The statute provides that a punishment for contempt does not prevent the offender from being prosecuted and punished for the crime itself included in the contempt. (Rev. Stat. P. R., sec. 146, p. 85.) If the contempt were a crime he could not be again punished for the same act but it is not so considered by the statutes of this Island, nor by the American law.

The mere denial of any criminal or disrespectful intention or design in publishing such an article as this, reflecting as it does on the conduct of the court in the decision of a case, does not and cannot justify the contemnor in a publication of this character. Chancellor Kent, that great master of jurisprudence, in considering this matter remarks "that the disavowal of any bad intent will not do away with the pernicious tendency or effect of publications reflecting on judicial

proceedings which are before us." (*People* v. *Freer,* 1 Caines, N. U., 519.) The meaning and intent of the accused must be determined by a fair interpretation of the language used. (*People* v. *Wilson,* 16 Am. Rep., 532 and 537.)

When the accused failed to answer and show cause under oath why he should not be punished for contempt, the court, having found that the publication constituted a contempt, was precluded from any other course than to punish him. His default prevented any excuses being made by any one in his behalf. (*Wartman* v. *Wartman,* Taney U. S. Dec., 369; *Carter* v. *Commonwealth,* 96 Va., 791; 45 L. R. A., 310.)

If Abril had come into court with a sworn answer, as he should have been required to do, and in that answer had stated that he was laboring under a misapprehension, and that the article was written in good faith, relying upon information believed at the time to be true but afterwards found to be false, and had therein apologized to the court for the contempt committed, and asked for clemency, and proposed to publish his apology in his newspaper with the same prominence that he had published the original article, then this case might have had some resemblance to the case cited by the court in its opinion, of *The People of the State of Colorado ex rel. Chas. Connor* v. *William Stapleton et al.,* 23 L. R. A., p. 137, and in accordance therewith there might have been some ground for the court to impose a light penalty, or to excuse the offence altogether; but under the circumstances and the testimony as presented by this case, as shown by the record itself, there is no ground whatever even for leniency, much less for entire exculpation.

As to the third reason given by the court for its action, that this is the first case of contempt originally presented to this court, it appears to me that this fact would rather indicate that a severe punishment should be awarded in order to prevent other cases being brought before the court, and in order to deter other offenders from committing like actions reprehensible in their nature and conducing to disorder

and disrespect to the courts of Porto Rico and to the paralysis of the machinery of public justice. If the first case presented is entirely ignored or palliated or excused, as in the matter now under consideration, then we may look for the second and the third, and many others to follow in quick succession. This being the first case of this kind presented to the court in the exercise of its original jurisdiction, does not by any means indicate that it is the first contempt of this kind which has been committed in this Island in the last seven years; on the contrary, others have reached this court on appeal and *habeas corpus,* and any man who reads newspapers will see that such occurrences take place almost daily, and that some members of the press of this Island have gone wild with the freedom supposed to have been accorded to it by the first amendment to the Constitution of the United States, and have mistaken the liberty which it enjoys under the flag of freedom for license to libel any one who may incur its displeasure, and to traduce public officers, judicial and others, according to its own inclination. There is a broad distinction to be drawn between liberty and license. Mr. Justice Thornton, of the Supreme Court of Illinois, speaking of the power of courts to punish for contempt, in a leading case decided by that eminent court, in the year 1872, says:

"It is no restriction upon the privilege, secured to every citizen in the bill of rights, that 'every person may freely speak, write and publish, on all subjects, being responsible for the abuse of that liberty.'

"These rights have well-defined limits. They are correlative, and must respect other rights. They are not independent of all control. Even liberty is not unlicensed, but it is regulated by law. The press can be free, in the broadest sense of the term, without blackening character or having a license to defame. Every man may freely speak and write without indulgence in slander or libel. Every branch of the government may be freely examined without false accusation and unjust charges of crimes against those who hold positions of trust. The truth is never to be feared, and may always be spoken and written; but the utterance of willful and deliberate falsehood, disguise it as you may with good intentions, is dangerous and

cowardly, and deserves punishment and reprobation. It is an abuse of the rights guaranteed by the Constitution." (*The People* v. *Wilson*, 16 Am. Rep., 546 and 547.)

The language quoted could not be more applicable to the case at bar had it been written by a member of our own court after hearing the trial of Abril on the 17th of the month having the same name. A study of the Wilson case would be profitable employment for newspaper editors and the lawyers who undertake to advise them.

The fourth reason given for acquittal, that the contempt committed has no grave characteristics, is certainly not founded in the record. The article published is an unmitigated falsehood. It accuses this court, and specially the honorable *ponente,* Mr. Justice Hernández, of doing an injustice to the plaintiff and to the Unionist Party in Toa Baja, by unnecessary and intentional delay. And moreover, the article concludes with a dictation and a threat couched in these remarkable words:

"And we demand, since the matter involved is a most urgent one and one which affects the life of a people, that less passiveness be shown, and that the opinion in the said matter be rendered without delay, and that the packages be opened, and that it be said whether the ballots in question are null or whether they are valid. This is our first signal to be on the alert. God grant that a second signal be not necessary."

The writer does not suggest, nor petition, nor request, nor pray, nor ask, but he demands that the court should expedite the matter pending before it, and not only demands that the matter be hurried to a decision, but dictates how the court shall decide the question; he directs that the packages be opened and that it be declared whether the ballots are null or valid. He concludes his demands upon this court by saying that this is the first signal to be on the alert, which is a threat, and indicates that a second denunciation more severe will follow if the first is not heeded.

It is difficult to conceive of a more arrogant and flagrant abuse of the liberty of the press; it is difficult to conceive of a more open, daring and ignominious menace to this court. Then, I cannot agree that the contempt committed has no grave characteristics. On the contrary, it appears to be of a very grave character, and deserving of a corresponding punishment.

The fifth reason given by the court, for the remarkable leniency shown in this case, is that the said offence is a new matter in the legislation of this Island; and that what is illegal may be easily believed to be excusable. It may be true that under the Spanish régime courts did not have the power to protect themselves from insult and contempt shown by publications in newspapers, or committed by attorneys or other persons by the use of what is known as contempt proceedings; certainly they did not enjoy the independence and freedom from restraint by the executive authority that they have under the American system; but it is useless to say or to intimate that such offenses as the present on the part of newspapers would have been tolerated or gone unpunished under the Spanish domination. Under the Spanish civil courts an adequate castigation was provided for offenses such as this, and a glance at the Penal Code of Porto Rico, in force under the Spanish domination, and not repealed until three years ago, shows us in Title III, Chapter V, the punishment prescribed for disrespect to authority (See Penal Code, art. 262 to 266), which is imprisonment from one month to six years, and a fine of from sixty-five to six hundred and fifty dollars. An act such as this would clearly fall under the classification of crimes enumerated in Chapter V. Such being the case what becomes of the fifth excuse put forward in behalf of the contemnor? It bursts like a soap bubble and vanishes away. It certainly does not appear that the publisher of such falsehood as this should be excused on the ground of such an offense being a new matter in the legislation of this Island. It is true that the punishment has been

mitigated, and that the method of administering it has been changed, and that liberty unheard of under the rule of a Spanish monarch has been granted to every scribbler who can command sufficient money to purchase a pailful of type and to hire a typesetter, but this is not reason why the restrictions imposed by the American laws on the freedom of the press should not be in force. These laws hold the press and its proprietors to strict liability for the abuse of the liberty which is granted to them by the constitution. (See case of *People* v. *Wilson* and other authorities cited above.)

The law under which this proceeding was conducted provides for the punishment of contempts such as this by imprisonment, not exceeding a period of thirty days, and by a fine, not exceeding $200, or by both such fine and imprisonment, in the discretion of the court. Evidently the legislative authority did not consider such a violation of the law to be a light matter, and in leaving the punishment to the discretion of the court it was not intended that such discretion should be affected by sympathy or pity, or other motives of that kind, but that it should be a sound judicial discretion fixing the punishment in accordance with the enormity of the crime.

Mr. Justice Keith, of the Supreme Court of Virginia, in a well-considered opinion of that court says:

"A judge, in vindicating the dignity and the authority of the court over which he presides, is discharging a solemn duty owed to his official character, and is not engaged in a personal and private controversy." *Carter* v. *Com.*, 96 Va., 791; 45 L. R. A., 314.

According to all the authorities which are available in the American courts, a violator of the laws in a case of this kind should be punished and the dignity of the court should be upheld.

The respect which ought to be shown to courts and judges, not only by attorneys but by the press, is not exacted for the sake of the individual occupying the judicial station, but

for the sake of the office itself. Whatever may be the opinion of any person in regard to the incumbent of the bench, respect for the judicial office and its functions should not be withheld nor any disrespect improperly expressed. A judge is restrained by the properties of his judicial position from defending himself, in courts or otherwise, against unreasonable strictures on his official conduct, however much such aspersions may tend to impair public confidence in the administration of justice, which has been justly said to be the chief end of all government. For this reason the press and the bar should refrain from intemperate criticism of judicial conduct, except when such action is in course of review in a higher court or a judge is on trial to determine his removal. The whole people, including the bar and the press, are interested in maintaining proper respect for courts of justice in the administration of their exalted functions.

Although further citations of authorities or quotations therefrom may not be necessary in the present case a few brief extracts from some of the numerous decisions to be found in the reports of the highest American courts may be useful in the investigation of future cases which are destined to arise in Porto Rico. The unanimity of opinion among American jurists and commentators on this question is as remarkable as the outspoken manner in which their views are expressed.

The Supreme Court of West Virginia, after reviewing a long list of authorities on the question of contempt of court and making a quotation from the opinion in *Watson* v. *Williams,* decided by the Supreme Court of Mississippi and reported in 36 Miss., 331, says:

"The right of punishing contempts by summary conviction is a necessary attribute of judicial power, inherent in all courts of justice from the very nature of their organization, and essential to their existence and protection and to the due administration of justice. It is a trust given to the courts not for themselves, but for the people whose laws they enforce, and whose authority they exercise, and each

court has the power for itself finally to adjudicate and punish contempts without interference from any other. The right to punish for contempts extends not only to acts which directly and openly insult and resist the powers of the court, or the persons of the judges, but to indirect and constructive contempts which obstruct the process and degrade the authority of the court.'' (*State* v. *Frew*, 49 Am. Rep., 261.)

And the same court quotes with approval an opinion of the Supreme Court of Illinois treating of the same subject, viz:

''In *People* v. *Wilson*, 64 Ill., 195, it was held that the power to punish for contempts is an incident to all courts of justice independent of statutory provisions; that the statute which declares that the Supreme Court 'shall have power to punish contempts offered by any person to it while sitting' merely affirms a pre-existent power, and does not attempt to restrict its exercise to contempts in the presence of the court, but leaves them to be determined by the principles of the common law. And if a statute should be regarded as a limitation upon the power of the court to punish for any other contempts than those committed in its presence, yet in this power would necessarily be included all acts calculated to impede, embarrass or obstruct the court in the administration of justice. Such acts would be considered as done in the presence of the court.''

And the Supreme Court of Illinois in that case punished, by attachment, the publisher and editor of a newspaper for publishing in a city of the State remote from where the court was sitting, a charge of bribery against the court on account of its action in a case pending on a writ of error (*State* v. *Frew*, 49 Am. Rep., 269); and finally the said learned court sums up the discussion thus:

''The courts must have just enough power and will exercise it for their own protection, and they want and demand no more. Whether or not the legislature in its regulation has left sufficient power for the purpose, the court, which is called to exercise it, must be the sole judge, unless its judgment may be reviewed and in that case the court of last resort would be the exclusive judge. There is no disposition in the courts to seek opportunities to exercise this power;

and it will not be exercised, unless there is a necessity for it. When a judge remembers that he has no right to avenge in this manner individual wrongs, but only an injury to the court, the people's court, it becomes a matter of stern and inflexible duty from the performance of·which under his official oath he dare not shrink. For he well knows, that as the ermine was spotless when he put it on, the people expect him to leave it as untarnished for his successor." (*State* v. *Frew,* 49 Am. Rep., 274.)

The Supreme Court of Iowa takes the same view as is shown by the following quotation from an elaborate opinion in the case of *Henry* v. *Ellis,* 49 Iowa, 205:

"In a proceeding for the punishment of a contempt growing out of publications alleged to be false, scandalous and defamatory, evidence is admissible to show the meaning and intent of the publications. But the better opinion seems to be that a good intent is no justification for publications reflecting upon pending judicial proceedings. It may mitigate the punishment, but does not excuse the crime. The meaning and intent of a published article are to be determined by a fair interpretation of the language used, and are matter of law for the court as to whether or not they constitute a contempt; and any disclaimer on the part of the publishers as to any intentional disrespect to the court is not a sufficient ground for discharging a rule to show cause why an attachment should not issue. But courts are lenient, and are not disposed to press this class of contempts to extreme measures. If the publication hardly amounts to a criminal contempt, or though the printer has commented in severe and opprobious terms upon pending judicial proceedings, if he appears and disclaims any disrespect towards the court or its officers, or the jury, counsel, etc., asserts that he had no intention of interfering with the due course of justice, and makes an humble apology, the court will seldom go further than to reprimand him, and impose costs upon him, or apportion the costs in its discretion. But the publisher is sometimes fined, and may even be committed to prison." (See note to *State* v. *Galloway,* 98 Am. Dec., 418.)

In regard to the inherent power of courts to punish acts committed in contempt of their authority it may be safely asserted that this power, beyond doubt, exists, subject to be limited and controlled by the same authority, constitutional

or statutory, by which the courts themselves were consti-
tuted. Of course so far as this court is concerned that author-
ity is the Congress of the United States. Among many auth-
orities sustaining this proposition reference may be had to
those mentioned and quoted from as follows:

It is said by a very eminent authority, the Supreme Court
of Ohio, as late as the year 1896:

"That it is not competent for the legislature to abridge the power
of courts to punish summarily such wrongful acts as obstruct the ad-
ministration of justice has been held in well considered cases. The
conclusion is a necessary inference from the very numerous cases in
which it has been held that the power inheres in courts independently
of legislative authority. A power which the legislature does not
give, it cannot take away. If power, distinguished from jurisdiction,
exists independently of legislation, it will continue to exist notwith-
standing legislation. From the numerous cases sustaining these
views, the following are selected, because of their elaborate review of
the authorities or their clear and vigorous statement of the principles
involved: *State* v. *Frew*, 24 W. Va., 416; 49 Am. Rep., 257; *Little* v.
*State*, 90 Ind., 338; 48 Am. Rep., 224; *Yates* v. *Lansing*, 5 Johns,
282; *State* v. *Morrill*, 16 Ark., 384; *Arnold* v. *Com.*, 80 Ky., 300; 44
Am. Rep., 480; *People* v. *Wilson*, 64 Ill., 195; 16 Am. Rep., 528; *Re
Woolley*, 11 Bush., 95; *United States* v. *Hudson*, 11 U. S.; 7 Cranch,
32, 3 L. ed., 259; *Watson* v. *Williams*, 36 Miss., 331; *Darby's Case*, 3
Wheel., C. C. I.; *Neel* v. *State*, 9 Ark., 259; 50 Am. Dec. 209; *State*
v. *Matthews*, 37 N. H., 450; *Cartwright's Case*, 114 Mass., 230."

(*Hale* v. *State*, 36 L. R. A., 259, 260.)

Mr. Justice Patterson, speaking for the Supreme Court
of California, in the Shortridge case, the latest decision of
that court on this subject accessible to us, says:

"No authority has been found which denies the inherent right of
a court in the absence of a limitation placed upon it by the power
which created it, to punish as a contempt an act, whether committed
in or out of its presence, which tends to impede, embarrass or ob-
struct the court in the discharge of its duties. It is a doctrine which
is admitted in all its rigor by American courts everywhere and does

not need the support of foreign authorities, based upon the fiction that the majesty of the king, represented in the persons of the judges, is always present in the court. It is founded upon the principle, which is coeval with the existence of the courts, and as necessary as the right of self-protection, that it is a necessary incident to the execution of the powers conferred upon the court, and is necessary to maintain its dignity, if not its very existence. It exists independently of statute. The legislative department may regulate the procedure and enlarge the power, but it cannot, without trenching upon the constitutional powers of the court, and destroying the antonomy of that system of checks and balances which is one of the chief features of our triple-department form of government, fetter the power itself. In Arkansas the legislature sanctioned the power of the court to punish as contempts certain enumerated acts, and no others. The court held that the sanction was merely declaratory of the common law, and that the prohibitory clause was entitled to respect as an opinion of a co-ordinate branch of the government, but was not binding upon the courts. *State* v. *Morrill,* 16 Ark., 384. This decision is in line with all the authorities. Although the power is necessarily an arbitrary one to a great extent it has been exercised by the courts in this country at least, only as an auxiliary means to attain the ends of justice. If abused by the judges at all, it has been only in the rarest instances. No one has realized more than the judges themselves the fact that a court cannot coerce the respect of the people for itself or its decisions, and the very delicacy of the power has proved to be a safeguard against its abuse. To this alone must be attributed the fact that although the inherent power referred to has been claimed and exercised by the courts of this country since the organization of the government, the framers of the Constitutions in all the States of the Union, except Georgia and Louisiana, have deemed it unnecessary to place any limitation upon the power of their courts to punish for contempts. Stimson, Am. Stat. Law, section 582.'' *In re Shortridge,* 21 L. R. A., 765.

Again in the Frew case the Supreme Court of West Virginia further discusses the question at some length as follows:

''It is conceded here in the argument that it is not in the power of the legislature to take from courts the inherent power possessed by them to punish contempts in the face of the courts; but it is in-

sisted that the legislature may at will deprive the courts of the power to punish summarily constructive contempts such as that described in the rule. At common law, as clearly appears, in Dandrige's case, the power to punish for such constructive contempts was as much an inherent because a necessary power, as to punish for direct contempts; and as we have seen, this position is abundantly sustained by authority. Does not the reason for the existence of the power as much obtain in the one case as the other? If an attorney at the bar should charge the court in its presence with being bribed to decide the case under argument against his client, no one would doubt for a moment the right of the court to summarily punish him for such contempt. Why? Not because he had interrupted the court in its dispatch of business; for there was no interruption in the hearing of the cause. The court would have the right to punish the offender, because the language used was designed and calculated to destroy the confidence of the people in the court, and to degrade the court in the opinion of the public, and to corrupt the streams of justice. In such case the court would be wanting in respect for the people, whose servant it is, if it did not summarily punish the offender. There may not have been a half dozen persons in the court-room to hear the charge of corruption against the court, yet it would be not only the right but the duty of the court to punish such a contempt. Is it not absurd to say, that if the same attorney had published the same charge in a newspaper printed in the town where the court was sitting, which was read by thousands, aye, read in the court-room within view of the court it was designed to affect, he would not be guilty of a contempt of court, for which he should be summarily punished? If a suit for libel would be an ample vindication, as it is stated by the judges who delivered the opinion in *Stuart* v. *People,* 3 Scam., in the one case, a slander suit would be in the other. Such a suggestion is disgusting to a man of honor. It will be a sorry day when the practice shall obtain among judges of the court of last resort, who hold the dearest interest of the people in their hands, when in their judicial capacity they may be grossly libeled, to leave their high positions and go before a jury in a libel suit, be subjected to the coarse criticism of defendant's counsel, and if they succeeded in their suit, have it cast in their teeth, that they were influenced by sordid motives. Who would have any respect for a judge who would pursue such a course? Would he not under such circumstances deserve the contempt of every good citizen? Besides, what right would he have individually to recover damages for a wrong committed against him in his judicial capacity, for an injury done the people in his person?

In such cases the individual must always be separated from the judge. The court has no right to punish as for contempt one who libels an individual, who happens to be the judge; but it is a contempt of the court, as such, and an insult to the people represented by the court, which alone the court can punish as such. Scarcely less repulsive to all sense of judicial dignity is the suggestion that the judge should play the role of prosecuting witness in the trial of an indictment for libel. If that day shall ever come, when such shall be the only protection left to courts of integrity, none but the base and vicious can be expected to occupy judicial positions." -

(*State* v. *Frew, 49* Am. Rep., 271.)

From the foregoing extracts, which might be extended into volumes, it is clearly seen what are the powers and duties of judicial tribunals in cases of this kind. As the court has no power to punish a contempt merely to gratify a personal feeling of indignation or resentment, if any judge could be found so base as to desire so to do, so the court has no right, in view of the law and judicial duty, to forgive an offense of this nature out of a mistaken idea of generosity, pity or benevolence. It is just as much incumbent on courts to punish contempts, when proved before them, as it is to apply the law concerning theft or arson or any other nefarious crime. It may be a more disagreeable duty, but it ought not to be avoided on that account. The more exacting a duty is the more careful should a man be to perform it fully and carefully. I do not presume to lay down rules for other judges to follow while merely stating my views on questions arising in the course of business as presented for my own consideration. Every man must follow the path of duty as he sees it marked out before him. My way is plain.

For my part I will never consent to abase the dignity or abdicate the authority of the court to which I belong, and I will never agree for it to become the target of insults, threats or falsehoods. It is to me a matter of regret that other members of this court do not agree with me in this matter; but confident as I am in the correctness of the position which

I have taken, as well as in the propriety of the course which I have indicated, I am prepared to maintain them on all proper occasions.